Moyer Reed PLASTER, Appellee,

v.

UNITED STATES of America,
Appellant.

No. 82–6575.

United States Court of Appeals,
Fourth Circuit.

Argued May 13, 1983.

Decided Oct. 20, 1983.

Gloria C. Phares, Dept. of Justice, Washington, D.C. (John P. Alderman, U.S. Atty., Jean B. Weld, Asst. U.S. Atty., Roanoke, Va., on brief), for appellant.

Carr L. Kinder, Jr., Roanoke, Va. (Bird, Kinder & Huffman, Roanoke, Va., on brief), for appellee.

Before WINTER, Chief Judge, ERVIN, Circuit Judge, and WYZANSKI,* Senior District Judge.

HARRISON L. WINTER, Chief Judge:

The United States of America appeals from a judgment of the district court granting a writ of habeas corpus to Moyer Reed Plaster, thus barring Plaster's scheduled extradition to the Federal Republic of Germany to stand trial for murder. We vacate the issuance of the writ and remand the case for further proceedings as set forth herein.

### I—*The SOFA Treaty*

We begin our narrative with a description of the pertinent treaties between the United States of America and the Federal Republic of Germany (West Germany). On June 19, 1951, the United States of America and West Germany, among others, signed the "Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of their Forces" ["SOFA Treaty"]. The treaty was subsequently ratified by the Senate and the President, and entered into force on August 23, 1953. T.I.A.S. No. 2846. Article VII of the SOFA Treaty provided rules for determining which country would exercise jurisdiction over servicemen who, while stationed overseas, committed crimes punishable both under the civilian laws of the host country and the military laws of the sending country. Section 3(a) of that article provided in such cases that primary jurisdiction would vest in the military authorities of the sending state when the offense was directed solely against the property or security of the sending country

---

\* Hon. Charles E. Wyzanski, Jr., Senior United States District Judge for the District of Massachusetts, sitting by designation.

(i.e., took place on the sending country's military base) or arose out of an act done in the performance of official duty. Section 3(b) of article VII provided that primary jurisdiction for all other offenses would lie in the host country. Finally, section 3(c) provided that the country having primary jurisdiction could, at its option, waive jurisdiction in favor of the other country, and indicated that sympathetic consideration should be given to requests by the other country for waivers of jurisdiction in cases deemed important by the other country.

On August 3, 1959, the United States and the Federal Republic of Germany signed a Supplementary Agreement to the SOFA Treaty; this Supplementary Agreement entered into force on July 1, 1963. T.I.A.S. No. 5351. In relevant part, this agreement implemented the waiver of primary jurisdiction provisions in section 3(c) of article VII of the SOFA Treaty. Article 19, paragraph 1, of the Supplementary Agreement provided that Germany would, upon a request of the United States, automatically waive its primary right to jurisdiction in favor of American military authorities. Paragraph 3, however, provided that Germany could, in a case where the exercise of German jurisdiction was deemed by Germany to be particularly important, recall its waiver of jurisdiction by so notifying the American authorities no more than twenty-one days after receipt of the American request for a waiver. Absent such a recall, however, jurisdiction would vest in the American military authorities.

## II—*The Facts*

As of March, 1965, Plaster and John Burt were soldiers in the Third Infantry Division of the United States Army, stationed near Schweinfurt, West Germany. The commanding general, or "convening authority,"[1] of the Third Infantry Division was General Robert Shellman, and its Staff Judge Advocate, legal adviser to General Shellman and chief military prosecutor,[2] was Colonel Robert Hart. Shellman and Hart also were the American military officials designated pursuant to the Supplementary Agreement as liaison to the German prosecutors for that sector of Germany.

On March 21, 1965, a West German taxicab driver, Kurt Pfeuffer, was murdered near Schweinfurt. Approximately three months later, apparently suspected of Pfeuffer's murder, Plaster and Burt deserted their posts and without authorization traveled to Madison, Wisconsin. In Wisconsin, Plaster and Burt, along with two other men, were arrested and charged with the July 1, 1965 murder of a gas station attendant, Leroy Erdahl. While in prison in Wisconsin on the local murder charges, Plaster and Burt were questioned by Army investigators about the German murder. Although both allegedly confessed to involvement in the German murder (Plaster allegedly as an accessory after the fact), these interrogations took place without the giving of *Miranda* warnings, presumably because *Miranda* had not yet been decided. On October 28, 1965, Plaster pled guilty to a charge of third degree murder for the Wisconsin killing and received a sentence of ten years imprisonment. Burt subsequently was sentenced to life imprisonment after being found guilty of first degree murder in the Wisconsin killing.

In December, 1965, the United States Army gave formal notification to Germany pursuant to Article 19, paragraph 1 of the Supplementary Agreement as to both Plaster and Burt, thus automatically obtaining a waiver of jurisdiction for the German murder. In January, 1966, the designated West German prosecutor, Dr. Hopf, sent a letter to the American military authorities informing them that Germany had decided not to recall its waiver of jurisdiction, but asking to be kept informed of the Army's efforts to obtain custody of Plaster and

---

1. Under the version of the Uniform Code of Military Justice then in effect, 10 U.S.C. §§ 801 *et seq.* (1964 ed.), the decision to convene a court-martial was that of the commanding officer of the Army division. *Id.* § 822(a)(3).

2. *See* 10 U.S.C. § 806(b) (1964 ed.).

Burt from Wisconsin so that they could stand trial in an American military court for the German murder. After receiving this letter, Colonel Hart filed formal court-martial charges against Plaster and Burt for the German murder.

This planned prosecution, however, abruptly ground to a halt when, on June 13, 1966, the Supreme Court decided in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that confessions obtained without a knowing and voluntary waiver of certain constitutional rights could not be used in American courts. General Shellman and Colonel Hart, in conjunction with Army attorneys, concluded that the confessions obtained from Plaster and Burt would not be admissible in a military court for want of a knowing and intelligent waiver of the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel. Moreover, they concluded that without these confessions, there was insufficient evidence upon which to prosecute either Plaster or Burt for the German murder.

Colonel Hart then, on instructions from General Shellman, relayed this decision not to prosecute Plaster or Burt to the West German prosecutor, Dr. Hopf. The German prosecutor was extremely upset, apparently not appreciating the values underlying the *Miranda* decision, which were, to some extent, foreign to the West German concept of justice. At this point, however, conflicting testimony was given, but the inconsistency was not resolved by the district court. Colonel Hart testified that it was his understanding that Dr. Hopf then notified his German superiors of the American decision, and that the German government protested General Shellman and Colonel Hart's decision to the Departments of State and Defense and sought to recall its waiver of jurisdiction. Shortly thereafter, Colonel Hart testified, he received a lengthy telephone call from Colonel Dennis York, who at the time, Hart indicated, was Chief of International Affairs for the United States Army, Europe. Hart testified that York told him that the Departments of State and Defense had jointly made a decision not to return Plaster or Burt to Germany and not to permit Germany, at this late date, to recall its waiver of jurisdiction under the Supplementary Agreement. Hart stated that Colonel York told him that the basis for this decision by State and Defense was that a contrary decision would set a bad precedent by permitting Germany, which had waived its jurisdiction in favor of the American military justice system, to demand the right to recall the waiver simply because Germany became dissatisfied with the exercise by the Army of its prosecutorial discretion (or for whatever reason). Although Hart personally was opposed to this decision—because he had to deal with the Germans on a daily basis—he testified that he was ordered to relay this decision to Dr. Hopf, and that he subsequently did so. Colonel York, however, testified that he did not recall any request by the Germans to recall their waiver of jurisdiction and that he never told Hart that the State and Defense Departments had made a joint decision not to return Plaster to Germany.

Colonel Hart and General Shellman then reached the conclusion that the only way to salvage any prosecution, in light of *Miranda* and the scarcity of other evidence, was to offer Plaster immunity from prosecution in exchange for testimony against Burt. This course apparently was chosen because the Army believed that Burt had committed the actual murder, while Plaster had merely been an accessory after the fact. The offer was prepared in the form of an immunity agreement, which was signed by General Shellman. Hart then called Dr. Hopf to inform him of the tactical decision, and Hopf consented to the decision to offer Plaster immunity in exchange for testimony against Burt.

Hart then had his deputy, Colonel Rarick, take the immunity agreement to the Wisconsin prison where Plaster was serving his sentence for the Wisconsin murder. Hart testified that the immunity agreement offered "transactional immunity," which he indicated would be total immunity against any prosecution arising out of the acts in question. Both Plaster and his attorney at

the time, Richard Lent, testified that the immunity agreement made clear that Plaster would be prosecuted neither by American nor German authorities, and the district court so found.

Plaster concluded to accept the Army's offer, and he and Lent signed the agreement. Hart testified that he then received a phone call from Rarick, who was still in Wisconsin, informing Hart that Plaster had agreed to cooperate. An affidavit[3] submitted by Colonel Rarick indicates that after Plaster signed the immunity agreement, he, Rarick, mailed the signed agreement back to Hart. Unfortunately, however, the agreement apparently was lost in the mails or by the Army and was never received by Colonel Hart.

Because Hart apparently never received the agreement and because he somehow never heard further from either Rarick or Lent, Hart concluded that Plaster had been unwilling to testify against Burt and that nothing further could be done to prosecute either. He testified that when Burt was convicted of the Wisconsin murder and Plaster had already pled guilty, the Army made a decision "at higher headquarters" not to proceed against either Plaster or Burt, since they were already in jail for lengthy terms in Wisconsin. Moreover, Hart testified that the West Germans were somewhat mollified by the Wisconsin convictions. Thus, the Army concluded to give administrative discharges to Plaster and Burt based on their civilian convictions in Wisconsin, and they were accordingly discharged from the Army.

3. Because the affiant, Colonel Rarick, was ill at the time this suit was filed, his deposition was taken *ex parte* by petitioner's attorney at Rarick's hospital room. Rarick died before the case came to trial.

4. Under 18 U.S.C. § 3186, the Secretary of State may extradite a person only after that person has been certified by a federal judge or magistrate to be extraditable under § 3184. Section 3184 provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate au-

Plaster was paroled from the Wisconsin State Penitentiary on November 26, 1969, to live with his parents in Martinsville, Virginia. The Wisconsin Parole Board discharged him on December 15, 1972. It appears that Burt remains in prison in Wisconsin.

### III—*The Proceedings to Date*

A new extradition treaty between the United States and the Federal Republic of Germany was signed on June 20, 1978 ["1978 Treaty"], and entered into force on August 29, 1980. T.I.A.S. No. 9785. Article 1 of this treaty imposes on each country an obligation to extradite persons found in one country who have committed crimes in the other. Included among the extraditable offenses under article 2 is murder. Further, article 31 provides that the treaty applies to offenses committed before as well as after the date that the treaty entered into force. Finally, article 7, section 1 of the treaty provides that

[n]either of the Contracting Parties shall be bound to extradite its own nationals. The competent executive authority of the Requested State, however, shall have the power to grant the extradition of its own nationals if, in its discretion, this is deemed proper to do and provided the law of the Requested State does not so preclude.

On May 12, 1981, the United States Attorney for the Western District of Virginia filed a complaint before the United States Magistrate for that district seeking certification of Plaster's extraditability pursuant to 18 U.S.C. § 3184.[4] Attached to the com-

thorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he

plaint were an affidavit from the State Department certifying the West German extradition request pursuant to the 1978 Treaty as well as various documents and statements indicating Plaster's involvement in the 1965 German murder. After taking evidence from the parties, the magistrate issued a certification of extraditability on May 28, 1981. He found that the crime alleged, murder, fell within the extradition provisions of the treaty and that there existed probable cause to believe that Plaster had been a participant in the murder.

On June 10, 1981, Plaster filed a petition for a writ of habeas corpus in the district court, pursuant to 28 U.S.C. § 2241. The petition indicated that the magistrate had ordered him to report to the United States Marshal on June 22, 1981, for extradition to Germany. The district court subsequently stayed the extradition pending a hearing on the merits of the habeas corpus petition. The court then held several hearings at which Hart, Plaster, Lent and York testified, and received into evidence various documents, including Rarick's deposition. The court also received numerous briefs from the parties.

In its opinion, the district court found that article 7 of the 1978 Treaty[5] barred extradition by the United States of American nationals if to do so would violate their constitutional rights. Moreover, the court found that, apart from any restrictions in the treaty, the United States may not, as a matter of constitutional law, extradite an individual if such extradition would violate his or her constitutional rights. Thus, although the district court agreed with the magistrate that the alleged crime fell within the scope of the treaty and that there existed probable cause to believe that Plaster committed the crime, the court proceeded to examine whether Plaster's extradition would violate his due process rights.[6] The

district court, determining that the right to be treated fairly by the government is at the core of the due process clause, barred the proposed extradition, which, in its view, would be in violation of the terms of the immunity agreement between Plaster and the government. Moreover, the court found that the absence of reliance by Plaster upon the immunity agreement (i.e., self-incrimination) would not defeat his right to enforcement of the bargain. Finally, the district court found that Hart had the authority, as a representative of the United States government, to bind the United States government not to extradite Plaster, and that that promise had, in the context of this case, been a reasonable tactical decision for Hart to make. Thus, concluding that extradition would violate the enforceable terms of the immunity agreement and thus Plaster's right to fundamental fairness, the district court granted the writ of habeas corpus.

The United States now appeals.

### IV—Discussion

Before us, the United States advances three principal arguments. First, it contends that the district court exceeded its limited scope of review by inquiring into whether extradition would violate Plaster's constitutional rights. Second, the government submits that even if extradition would violate Plaster's rights, the district court had no jurisdiction to grant a writ of habeas corpus, because that would, it is alleged, be an impermissible remedy for that violation. Finally, the government argues that, in any event, the district court erred in holding that, as a matter of law, extradition would violate Plaster's constitutional rights. We consider them seriatim.

### A—Scope of Review

The district court found two bases for its asserted jurisdiction to determine whether

---

shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the

person so charged to the proper jail, there to remain until such surrender shall be made.

5. See page 10 supra.

6. The magistrate properly had refused to entertain this claim as being outside the scope of his § 3184 jurisdiction.

extradition would violate Plaster's constitutional rights. First, the court interpreted article 7 of the 1978 Treaty, which provides that the executive branch of the requested country shall have the power to extradite its own nationals "provided the law of the Requested State does not so preclude," as barring the extradition of American nationals where such extradition would violate the Constitution or laws of the United States. The government concedes that the district court acted within its proper scope of review in examining whether the terms of the treaty bar extradition,[7] but asserts that the district court misinterpreted the treaty. Specifically, the government contends that although the plain language of the treaty provision in question is written so as to apply equally to both countries, the executive documents accompanying the treaty to the Senate for ratification reveal that it was intended to refer only to the provision in the German constitution barring extradition by Germany of its nationals.

As the Supreme Court has recently noted, interpretation of a treaty must begin with the language of the treaty itself, and the "clear import of [the] treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982) (quoting *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963)). After examining the various documents accompanying the treaty during its formation and ratification, we conclude that the government's interpretation is correct. A provision in the German constitution makes it unlawful to extradite German "nationals," and thus the proviso was added to assure German legislators that the treaty was in compliance with that provision of

the German constitution. The United States Constitution, of course, has no such bar.[8] And although this interpretation results in a ratchet whereby the United States must extradite its nationals while Germany will not, this is equalized by the fact that, under German law, German courts have jurisdiction to punish crimes committed by Germans outside their country, while American courts generally do not have jurisdiction over crimes committed outside the United States. Thus, a German national who commits a crime in America and returns to Germany can be tried in German courts, while an American who commits a crime in Germany and returns to America cannot be tried in American courts—he must be extradited to Germany if he is to stand trial for his crime. For that reason, we conclude that the cited language from the treaty refers only to that specific provision of the German constitution and cannot provide a basis for the district court's asserted jurisdiction to determine whether extradition would violate Plaster's constitutional rights.

We conclude, however, that the district court was correct in its alternative ruling that it had jurisdiction to issue this writ of habeas corpus against unlawful federal detention pursuant to 28 U.S.C. § 2241. The parties agree that no direct review was available from the magistrate's certification of Plaster's extraditability under § 3184, and that habeas corpus was the proper procedural path for judicial review of Plaster's extraditability. The government argues, however, that the scope of habeas corpus review of international extradition proceedings is a narrow one, quoting Justice Holmes:

> It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate

---

7. Section 3184 provides that the magistrate must determine whether there is evidence sufficient to sustain the charge "under the provisions of the proper treaty or convention."

8. Indeed, the United States Constitution never refers to "nationals," and the due process clause protects all persons, not merely citizens. This reinforces the view that the proviso refers only to the specific German constitutional provision banning extradition of nationals.

had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925). Additionally, the government notes that this standard continues to be quoted as the proper scope of habeas corpus review of § 3184 proceedings. *See Hooker v. Klein,* 573 F.2d 1360, 1364 (9 Cir.), *cert. denied,* 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978); *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2 Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

■ It is critical to note, however, that neither *Fernandez v. Phillips* nor the cases that have followed it have considered the scope of habeas corpus in connection with a claim that the actions of the United States government in extraditing the petitioner would violate his constitutional rights. It is well-settled, however, that the United States government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution, and that treaty obligations cannot justify otherwise unconstitutional governmental · conduct. *See Reid v. Covert,* 354 U.S. 1, 16–19, 77 S.Ct. 1222, 1230–32, 1 L.Ed.2d 1148 (1957) (plurality opinion); *In re Aircrash,* 684 F.2d 1301, 1308–09 (9 Cir.1982); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Auth.,* 651 F.2d 800, 813 n. 20 (1 Cir.1981); *Rosado v. Civiletti,* 621 F.2d 1179, 1195–96 (2 Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980); *Edwards v. Carter,* 580 F.2d 1055, 1058 (D.C.Cir.), *cert. denied,* 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978); *Holmes v. Laird,* 459 F.2d 1211, 1217 (D.C.Cir.) (specifically holding that the United States Constitution overrides the SOFA Treaty and the USA–FRG Supplementary Agreement), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); *Bell v. Clark,* 437 F.2d 200, 203 (4 Cir.1971) (testing treaty against Constitution). And because a claim of unconstitutional governmental conduct is within the scope of habeas corpus review

mandated by both the Constitution itself, U.S. Const. art. I, sec. 9, cl. 2, and the applicable federal statute, 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless [h]e is in custody in violation of the Constitution or laws or treaties of the United States."), we conclude that the district court was correct in entertaining Plaster's claim.

Our conclusion that the judiciary has jurisdiction to ensure that the Executive's power to extradite is not being exercised so as to violate individual constitutional rights is fully supported by the Fifth Circuit's decision in *Geisser v. United States,* 513 F.2d 862 (5 Cir.1975). There the government and defendant had entered into an agreement whereby the defendant agreed to plead guilty to a lesser charge and to testify against her co-conspirators in exchange for the government's promise, *inter alia,* to use its best efforts to prevent her extradition to Switzerland or France. After defendant's performance of her part of the bargain, the government, at the request of the Swiss, sought and obtained a certification of extraditability pursuant to § 3184. The defendant then sought a writ of habeas corpus, alleging that the government had not used its best efforts to persuade the Swiss government to drop its extradition request, and the district court granted the writ. On appeal, the Fifth Circuit vacated the judgment granting habeas relief but ordered the government specifically to perform its promise to use its best efforts to persuade the Swiss to drop their request. The court implied strongly that extradition in violation of the plea agreement (i.e., prior to the exertion of the government's best efforts) would be unconstitutional and impermissible. *Id.* at 869 & n. 11. Moreover, when the case came twice again before the court, on review of the district court's findings that the government still had not performed its obligations under the agreement, the court stated plainly that extradition could not proceed so long as it would violate the defendant's constitutional rights by breaching the plea agreement. *See Petition of Geisser,* 554 F.2d 698, 704–06 (5

Cir.1977); *Petition of Geisser,* 627 F.2d 745, 750 (5 Cir.1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981).

As to the procedure whereby a person whose extraditability has been certified by the Magistrate may receive an adjudication on his claim that the United States government's act of extraditing him would violate his constitutional rights,[9] we think that habeas corpus review of the § 3184 hearing, pursuant to § 2241(c)(3), is the appropriate device. Our view is supported by the fact that the Supreme Court has adjudicated—although it ultimately rejected—an argument, raised on habeas corpus review of a § 3184 hearing, that the petitioner's extradition would violate his constitutional rights. *See Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901).

The government advances two arguments against the conclusion we reach. First, it argues that the extradition power of the United States is *sui generis* and commits the consideration of alleged constitutional violations solely to the Secretary of State and the President. We disagree. Although the power and the discretion of the Executive is undoubtedly great in matters of foreign relations, the cases to which we have referred demonstrate that the exercise of this power is limited by the provisions of the federal constitution. And, unquestionably, it is the province of the judiciary to adjudicate claims that governmental conduct is in violation of the Constitution. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Thus, although the Secretary of State and the President have the discretion *not* to extradite an individual for any reason whatsoever, including, for instance, a concern as to deficiencies in the judicial process in the requesting country, *see Eain v. Wilkes,* 641 F.2d 504, 508 (7 Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Collier v. Vacca-*

*ro,* 51 F.2d 17, 20 (4 Cir.1931), they may not choose to extradite an individual where such extradition would, in the opinion of the judiciary, violate the individual's constitutional rights.

The government alternatively argues that even if a procedure must be available whereby the judiciary can hear such claims, that procedure should involve a hearing separate and apart from the "normal"[10] habeas corpus review of § 3184 proceedings. The government argues that because the Federal Rules of Evidence apply to habeas corpus proceedings, *see* Fed.R. Evid. 1101(b), but not to extradition proceedings, *see* Fed.R.Evid. 1101(d)(3), separate hearings are required. We do not think, however, that separate hearings are either required or desirable. Such a requirement would lead to a substantial duplication of time and effort. Moreover, as will become clear below, cases involving a conflict between the government's power to extradite and an individual's asserted constitutional rights are not well suited to formalized proceedings in which rigid rules of evidence and procedure are employed. As such cases will often involve delicate questions of international diplomacy and numerous international and governmental actors, we think that the district court must be free to dispense with the formal rules of evidence where such a course is suggested by the nature of the case. We therefore conclude that the proper procedure, as was followed by the district court, is to entertain the constitutional claim in the same proceeding that also, under *Fernandez v. Phillips, supra,* 268 U.S. at 312, 45 S.Ct. at 542, makes a limited inquiry into the validity of the § 3184 extraditability determination.

*B—Power to Grant Habeas Corpus Relief*

The government's second argument is that even if an immunity agreement consti-

**9.** It is settled that the petitioner cannot block his extradition simply because the other country's judicial procedures do not comport with the requirements of our constitution. *See Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901). Instead, he must claim that

the conduct of *our* government is violating his constitutional rights.

**10.** That is, the limited review under *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925), as set forth on page 16 *supra.*

tuting a valid executory contract existed and even if extradition would violate that contract, the district court lacked jurisdiction in this habeas corpus proceeding because granting such relief would be an impermissible remedy for that violation.[11] In this regard, the government points particularly to the absence of detrimental reliance by Plaster and to the allegedly weighty foreign affairs implications of a refusal to extradite as reasons why habeas corpus relief should not be available.

As to the absence of detrimental reliance or part-performance by Plaster, it is plain that, under normal principles of contract law, each side to an executory contract is entitled to its "expectation" from mutual performance. Neither side is permitted unilaterally to cancel the agreement and demand restoration of the precontract situation simply because the other party has not yet performed or relied to its detriment. Hence, under normal contract law, Plaster would be entitled to his "expectation" value from fulfillment of the government's promise that he would be immune from any further prosecution, German or American, arising out of the German murder.[12]

■ Under the present circumstances, it would appear that habeas corpus relief would be required in order to grant Plaster an appropriate and effective remedy. First, simply permitting Plaster to exercise his right to a trial in Germany is to give him no remedy at all for his lost expectation value. In addition, we do not think that an award of monetary damages may seriously be regarded as an appropriate remedy for the breach of a promise not to extradite a person to another country to stand trial for murder.[13]

Moreover, the remedy for the breach of the agreement must be tested against principles of fundamental fairness, pursuant to the due process clause of the Fifth Amendment. Plaster in good faith signed the immunity agreement and has never refused to perform his part of the bargain. Instead, as noted above, it was through the sole fault of the government in losing the signed agreement mailed from Rarick to Hart, and in—inexplicably—not having any further communication between Rarick and Hart, that Plaster was never called upon to fulfill his part of the bargain. Some fifteen years then elapsed, during which time Plaster was released from Wisconsin prison and began a productive new life on the well-founded belief that he had put these events behind him.[14] Under these circumstances, we think that fundamental fairness could well require habeas corpus relief and enforcement of the government's promise not to extradite Plaster to Germany for the 1965 murder.

■ In addition, we do not think that the foreign policy implications of a refusal to extradite Plaster are sufficient to divest the jurisdiction of the district court to grant habeas corpus relief. First, an underlying premise of *Reid v. Covert, supra,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148, is that the mere presence of treaty obligations is generally insufficient to override constitutional rights.[15] Second, the facts of this case belie the grave consequences the government would forecast. The German government originally waived its primary jurisdiction for the crime, consented to the decision to grant Plaster immunity from any further prosecution, and indicated, after the state

---

11. The government does not argue that the case is premature in that extradition itself has not yet occurred, conceding that, if the agreement exists, it effectively already has been breached by the government's arrest of Plaster and its petitioning for a certification of his extraditability.

12. *Accord, Johnson v. Mabry,* 707 F.2d 323, 330 (8 Cir.1983). *See also* P. Westen & D. Westin, *A Constitutional Law of Remedies for Broken Plea Agreements,* 66 Calif.L.Rev. 471, 512–14

(1978) (applying this analysis to broken plea agreements).

13. *Accord,* P. Westen & D. Westin, *supra* note 12, at 513 & n. 144.

14. *See* note 26 *infra.*

15. *See also Petition of Geisser,* 554 F.2d 698, 704 (5 Cir.1977) ("the reaction of the [foreign government] is irrelevant to the Government's obligation to keep its agreement").

court convictions, that it was willing to "let the grass grow."

Further, it is not clear to us that the governments of the United States and West Germany cannot still make use in some way of Plaster's testimony in a future proceeding against Burt, as originally intended. It is true that because Burt is no longer in the Army he would have to be extradited under the 1978 treaty and brought to German civilian courts to stand trial,[16] and thus that Plaster could not be forced to appear in person to testify against Burt at his trial. Nonetheless, it certainly is possible that the German court trying Burt might admit into evidence transcripts of statements given by Plaster under direct- and cross-examination here in the United States. Thus, given that the record indicates that the United States is attempting to extradite Burt to Germany to stand trial there for the 1965 murder, it does not appear that the immunity agreement with Plaster has become totally worthless to the government.[17] For all of these reasons, we conclude that habeas corpus relief is available and potentially appropriate, and that the district court correctly exercised its jurisdiction under 28 U.S.C. § 2241.

### C—Was there an Enforceable Agreement?

Having determined that the district court had jurisdiction to entertain Plaster's claim that extradition would violate his constitutional rights as well as his request for habeas corpus relief, we turn to the merits of that claim. The starting point for this inquiry is *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). In *Santobello,* the defendant entered a guilty plea as part of an agreement with the

government that the prosecutor would make no recommendation as to sentence. At the time of sentencing, however, a different prosecutor appeared and recommended the maximum sentence. On certiorari, the Supreme Court vacated the sentence, ruling that when a guilty plea has been induced by the prosecutor's promise regarding sentencing, "such promise must be fulfilled." *Id.* at 262, 92 S.Ct. at 499.[18] Thus, the Court remanded the case for either specific performance of the plea agreement or, if necessary, withdrawal of the guilty plea. *Id.* at 263, 92 S.Ct. at 499.[19] As has frequently been noted, however, the Court did not identify the specific legal basis for its holding or the limits of its application.

Our early cases applying this holding involved facts similar to those in *Santobello* itself and therefore did not require us, either, to identify the basis for the rule or the extent of its application. In *United States v. Hammerman,* 528 F.2d 326 (4 Cir.1975); *United States v. Brown,* 500 F.2d 375 (4 Cir.1974); and *United States v. Carter,* 454 F.2d 426 (4 Cir.1972) (in banc), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974), we applied *Santobello* to cases where, as in *Santobello* itself, defendants had pleaded guilty based upon fully-negotiated and executed plea bargains with the prosecutors. In those cases there was a complete executory contract in which the defendant had performed his side of the bargain; thus we had no difficulty in finding that non-performance by the government of its side of the agreement would violate the defendant's rights and entitle him to some remedy.

---

**16.** The record reveals that such extradition proceedings are under way.

**17.** Even if for some reason such use cannot be made of Plaster's information, the other factors indicate the possible necessity of specific performance. But we note this factor because the government's failure to mention it demonstrates the government's lack of effort to defend and protect the immunity agreement from German objections.

**18.** The Court noted, generally, that the courts must ensure that the defendant gets what is

"reasonably due" under the circumstances of the plea bargaining phase of the criminal justice process. 404 U.S. at 262, 92 S.Ct. at 499.

**19.** Although the main opinion left this choice to the discretion of the state court on remand, a majority of the Court held that the defendant's choice should be given "considerable, if not controlling, weight." 404 U.S. at 267, 92 S.Ct. at 501 (Douglas, J., concurring); *id.* 404 U.S. at 268 n. *, 92 S.Ct. at 502 n. * (Marshall, J., concurring in part and dissenting in part).

In *Cooper v. United States,* 594 F.2d 12 (4 Cir.1979), however, we were presented with a case in which a plea agreement offered by an Assistant United States Attorney and communicated to the defendant by his lawyer was withdrawn by the government before the defense attorney could accept the offer, and where the defendant had not relied to his detriment upon the withdrawn offer. We nonetheless held that the defendant was entitled to specific performance, to the extent still possible, of the plea agreement. In reviewing the defendant's claim of entitlement to enforcement of the offered agreement, we emphasized our view that the enforceability of plea agreements, as announced in *Santobello,* is based on principles of fundamental fairness arising from the due process clause of the Fifth and Fourteenth Amendments.[20] Thus, we found that principles of contract law, which implicate entirely different concerns of economic efficiency in a situation involving equally strong parties, may not properly be applicable to the prosecutor-defendant agreement context.[21] Indeed, we noted that fundamental fairness under the specific circumstances in *Cooper*—an unambiguous and reasonable proposal, made by a prosecutor with apparent, and probably actual, authority, relayed to and assented to by the defendant, and withdrawn by sheer fortuity, just before the defense lawyer

could accept, because of second-guessing by a superior—required enforcement of the agreement despite its not having been accepted under principles of contract law.[22] We have subsequently held, however, that principles of fundamental fairness are satisfied by the application of normal contract principles in the plea bargain context where the contested issues involve the content of the agreement or the authority of the parties to enter into the agreement.[23] *See United States v. McIntosh,* 612 F.2d 835 (4 Cir.1979).

■ It thus is clear that the breach by the government of an enforceable prosecutor-defendant agreement violates the defendant's right to due process of law. In the present case, however, the government argues that two fatal flaws, overlooked by the district court, prevented formation of an enforceable agreement. First, the government argues that immunity agreements only become enforceable upon self-incrimination by the accused, and that Plaster never incriminated himself here. In addition, the government submits that the military officials had no actual and/or apparent authority to bind the President of the United States not to extradite Plaster, as the immunity agreement purported to do.

The government's first argument is that the immunity grant made by the Army to Plaster could not become enforceable by

**20.** *See also United States v. Carter,* 454 F.2d 426, 428 (4 Cir.1972) (in banc) ("There is more at stake than just the liberty of this defendant. At stake is the honor of the government, public confidence in the fair administration of justice, and the efficient administration of justice in a federal scheme of government."), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974).

We also held that the Sixth Amendment right to effective assistance of counsel is implicated. Because the government's offer is communicated to the accused by his attorney, the credibility and integrity of the attorney may, from the client's point of view, be undermined by a sudden change in or retraction of an offer that the client has accepted. This fact, we ruled, "add[s] a heightened degree of obligation to the government's fundamental duty to negotiate with scrupulous fairness in seeking guilty pleas." 594 F.2d at 19.

**21.** *Accord, United States v. Calabrese,* 645 F.2d 1379, 1390 (10 Cir.), *cert. denied,* 451 U.S. 1018,

101 S.Ct. 3008, 69 L.Ed.2d 390 (1981); *United States ex rel. Selikoff v. Commissioner of Correction,* 524 F.2d 650, 654 (2 Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976).

**22.** *Accord, Johnson v. Mabry,* 707 F.2d 323 (8 Cir.1983). *But see Government of the Virgin Islands v. Scotland,* 614 F.2d 360 (3 Cir.1980).

**23.** Under traditional agency law, of course, authority can be either actual or apparent. *See* Restatement (Second) of Agency § 27 (1958); *see also* page 32 *infra.* In *McIntosh,* the state prosecutor promised the defendant that he would not be prosecuted by the Internal Revenue Service. Because the prosecutor was not an agent or employee of the federal government, we held that he had neither actual nor apparent authority, and that the agreement could not bind the I.R.S.

him unless and until he incriminated himself, which he never did. The asserted basis for this argument is the rule that once the government grants an individual immunity, he no longer may invoke his Fifth Amendment privilege against self-incrimination. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 79, 84 S.Ct. 1594, 1609–10, 12 L.Ed.2d 678 (1964). The government reasons that it got no consideration for its promise to grant immunity in the future, in that Plaster's return promise to testify fully thereafter is nothing more than an acknowledgement of his legal duty in that event. Indeed, contends the government, an executory immunity agreement is never enforceable for want of consideration; such an agreement is enforceable only after the defendant's "performance," i.e., his self-incrimination.

■ Although we of course do not decide whether executory immunity agreements generally are enforceable by the defendant, we conclude that the present agreement was not void for lack of consideration. First, the decision to proceed by means of an executory immunity agreement was the government's. That decision may well have reflected a pragmatic realization that willing participants who have agreed in advance to aid the government make better and more cooperative witnesses than do those persons brought into court against their will, given immunity on the spot, and asked questions for which they have not prepared.

Second, the government's argument overlooks the fact that this immunity agreement arose in the military, rather than civilian, context. In United States v. Kirsch, 15 C.M.A. 84 (1964), the Court of Military Appeals held that a commanding general has the authority, under the Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq.* (1964 ed.), to grant immunity from prosecution for military offenses to *prospective* witnesses under his command. 15 C.M.A. at 92–95. The court emphasized that, due to the exigencies inherent in the military context, the immunity power of a commanding general must be construed so as to provide him with the ability to make a valid and binding grant of immunity or even pardon so as to get information from the accused or in any other way to aid the military effort. We thus find that General Shellman's decision to make a binding immunity agreement was well within the "transcendental nature of the power of a commander having courts-martial authority to exonerate from punishment." *Id.* at 92.

Moreover, as discussed above, we must examine the propriety of the government's attempted withdrawal from the agreement not simply as a matter of contract law, but rather against a standard of fundamental fairness.[24] In this regard, the fifteen years that elapsed between the time that the agreement was signed and the time that the government tried to withdraw from the agreement must be considered.[25] Although Plaster did not incriminate himself, he did for all those years believe, based on the government's promise, that the incident had been put behind him and that he could start a new life.[26] We think, therefore, that it

---

**24.** The attempted withdrawal also implicates the Sixth Amendment right to counsel. *See* note 20 *supra.* The proposed immunity agreement was relayed to Plaster from Colonel Rarick through Plaster's lawyer, Richard Lent. Permitting the government to renege on the agreement would undermine Plaster's confidence in Lent's capability and integrity, thus destroying, perhaps, the effectiveness of his present counsel's assistance.

**25.** We have also indicated that a factor to be considered in deciding whether the government may withdraw from an offered agreement prior to reliance by the defendant is the reason behind the government's change of mind. *See*

*Cooper v. United States,* 594 F.2d 12, 19 (4 Cir.1979). Here the reasons are wholly uncompelling: first, the government's losing of the agreement and failing to have Hart and Rarick communicate with each other resulted in the failure to prosecute Burt, and second, second-guessing by the German authorities of General Shellman and Colonel Hart's exercise of their discretion in light of an unexpected Supreme Court decision.

**26.** Both the testimony at trial and a letter from the Deputy Chief Probation and Parole Officer demonstrated that Plaster has had no trouble with the law subsequent to his release from Wisconsin prison, has held the same steady job

would be fundamentally unfair to permit the government to withdraw from the agreement at this late date. Thus, for these reasons, we conclude that the agreement is not invalid for want of consideration.

The second principal question is whether General Shellman and Colonel Hart had the authority to include in the immunity agreement a promise, binding on the President of the United States, not to extradite Plaster. Although we have indicated that precise formalisms as to actual authority will not be controlling as regards the enforceability of plea bargains, see *United States v. Carter, supra,* 454 F.2d at 428, we have held that there must at a minimum be apparent authority. See *United States v. McIntosh, supra,* 612 F.2d at 837; *see also Cooper v. United States, supra,* 594 F.2d at 19 (noting the presence of apparent, and probably actual, authority); *United States v. Hammerman, supra,* 528 F.2d at 330–31.

█ Within the parameters established by the Constitution, the ultimate decision to extradite is, as has frequently been noted, reserved to the Executive as among its powers to conduct foreign affairs. See *Escobedo v. United States,* 623 F.2d 1098, 1105 (5 Cir.) (citing cases), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4 Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977). The "Executive," however, cannot be construed so broadly as to include all officers of the executive branch of government. Instead, we think it plain that the decision to extradite is reserved to the President and, by a

limited delegation of authority, to the Secretary of State. See 18 U.S.C. § 3186 ("The Secretary of State may order the person . . . to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged.").

█ Unquestionably there is substantial precedent for the proposition that promises made during plea bargaining by government agents are not ultra vires for lack of authority. See *Palermo v. Warden,* 545 F.2d 286, 295–96 (2 Cir.1976) (citing cases), *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977). And undeniably General Shellman is an agent of the United States government whose promise outside his authority might—even if unfulfillable—be enforced if made during plea bargaining. *Id.* We think, however, that the extradition power, as it involves issues of foreign affairs, must be preserved within the Executive's discretion to the extent permitted by constitutional limitations. We thus conclude that the mere claim to such authority by a government official is insufficient to create apparent authority, and that defense counsel must be charged with that knowledge. Instead, the official must have some articulable indication that authority was delegated to him by the President or the Secretary of State.

█ It therefore follows that neither General Shellman nor Colonel Hart, simply in their roles as members of the executive branch of the United States government, had either actual or apparent authority to bind "the Executive" —that is, the President—not to extradite Plaster.[27] We thus turn to the question of whether, under the

in Martinsville ever since, and has become a fully productive member of society.

**27.** *But see Geisser v. United States,* 513 F.2d 862 (5 Cir.1975). In *Geisser,* the Justice Department and the local U.S. Attorney's Office entered into a plea bargain with an accused heroin smuggler. The agreement provided that in return for the defendant's disclosure of her knowledge of the drug conspiracy, testimony against her superiors in the conspiracy, and guilty plea to a lesser charge, the government would drop the more serious charges, secure her parole in three years, and use its best efforts to prevent her extradition to Switzer-

land or France. Subsequently the government sought and obtained a certificate of her extraditability, and she sought a writ of habeas corpus. The Fifth Circuit rejected the argument that the Justice Department was without authority to bind the Secretary of State to use his best efforts to convince the foreign government to drop its extradition requests. A subsequent Fifth Circuit case suggested, however, that the result on the issue of authority might have been different had the promise been an absolute one of no extradition, rather than merely "best efforts." See *Dresser Industries, Inc. v. United States,* 596 F.2d 1231, 1237 n. 4 (5 Cir.1979),

particular facts of this case, Hart and Shellman specifically were delegated the necessary authority by the Secretary of State.

 We conclude that this issue must be returned to the district court. As noted above, Hart testified that when he relayed to the German prosecutor the Army's decision not to proceed against Plaster and Burt for lack of evidence, the German government protested this decision to the Departments of State and Defense. Colonel Hart said that he then received a telephone call from Colonel York, Chief of International Affairs for the United States Army, Europe, who, Hart said, told him that the State and Defense Departments had made a joint final decision not to extradite Plaster or Burt and that he, Hart, should continue to use his discretion as to how best to handle the case. Hart testified that he was informed that the rationale of the State Department for its decision was that it would set a bad precedent to permit the German authorities to recall their waiver of jurisdiction if they became displeased with how the American military prosecutors were exercising their prosecutorial discretion. Were it to be true that the State Department through its liaison told Hart that a final decision had been made that Plaster would not be extradited and that

Hart should continue using his best judgment to get some sort of conviction out of the case, we would have no trouble agreeing with the district court that Hart had been delegated the authority to promise Plaster, as part of the agreement in exchange for his testimony against Burt, that the United States government would not extradite him to Germany and that he would be prosecuted neither here nor in Germany for the 1965 murder.[28] But Colonel York specifically contradicted this testimony, indicating that he did not recall making any such statements to Colonel Hart, and the district court made no finding as to this disputed fact. Because of our conclusion, expressed above, that General Shellman and Colonel Hart must have had some indication of a grant of authority to them before they could make a binding promise to Plaster that he would not be extradited, this factual issue must be resolved.[29] We therefore remand this issue to the district court for further proceedings not inconsistent with what is set forth herein.

VACATED AND REMANDED.

cert. denied, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980).

**28.** Were we to hold that the Executive is bound by the promise made to Plaster, we would not need to decide whether promises made to individuals by one Secretary of State are in all circumstances binding on future Executives. The government has not contended before us that the present case presents extraordinarily weighty or acute problems for our international relations, and the German government has at several times in the past consented either to giving Plaster immunity or to "let[ting] the grass grow." See page 351 infra.

**29.** We perceive an alternative basis on which extradition may be barred. It is possible that the exercise by General Shellman of his unquestioned actual authority to grant Plaster immunity from military prosecution should serve to bar extradition and prosecution of Plaster by the German civilian authorities under the double jeopardy clauses of the SOFA and 1978 treaties. Both treaties provide that where an individual has been subjected to jeopardy by one sovereign (here court-martial by the United

States Army), he may not subsequently be tried for the same offense by the other sovereign. See SOFA Treaty art. VII, § 8; 1978 Treaty art. 8. It is beyond dispute that General Shellman had the actual authority to make any final and binding disposition of the military charges against Plaster. See United States v. Kirsch, 15 C.M.A. 84, 92 (1964), discussed supra page 30. The question for decision, therefore, would be whether jeopardy attached, for purposes of the treaties, where that disposition took the form of a "mere" immunity agreement. No extra grant of authority from the Secretary of State to the Army would be necessary for this analysis, because it would be the treaties themselves, and not the Army prosecutors, that forbade extradition. Although Kirsch seems to equate the grant of immunity by a military commander to a full pardon, id. at 92, we do not decide this issue at this time. It has not been raised by Plaster, and it ought not be decided without the benefit of full briefing and argument. On remand, however, Plaster is free to raise it.