Moyer Reed PLASTER, Appellee,

v.

UNITED STATES of America,
Appellant.

No. 85–6503.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1985.
Decided April 29, 1986.

John F. DePue, Dept. of Justice, Washington, D.C. (Jean B. Weld, Asst. U.S. Atty., John P. Alderman, U.S. Atty., Roanoke, Va., on brief), for appellant.

Carr L. Kinder, Jr. (Bird, Kinder & Huffman, Roanoke, Va., on brief), for appellee.

Before WINTER, Chief Judge, WILKINSON, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

In a previous appeal, we remanded the application of Moyer Reed Plaster for a writ of habeas corpus, which the district court had granted, to free him from extradition to the Federal Republic of Germany to stand trial for murder. We ruled that extradition would be in violation of Plaster's constitutional rights if in fact Colonel Hart, who promised Plaster immunity from prosecution and extradition in exchange for testimony against Burt, another suspect, had authority to make the promise. Because there was a conflict in the evidence as to whether Colonel Hart had been told by the State Department that a final decision had been made not to extradite Plaster so as to authorize him to grant immunity, we remanded the case for resolution of this factual issue. *Plaster v. United States*, 720 F.2d 340 (4 Cir.1983).

On remand the district court 605 F.Supp. 1532 found that Colonel Hart had been so advised, and it directed that the writ issue. The government appeals, contending that the finding that Hart was so advised is clearly erroneous and that, in any event, the decision in *Mabry v. Johnson*, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), decided after the first appeal, requires us now to conclude that Plaster, never having given testimony against Burt, had no constitutional right that would be violated by his extradition and trial in West Germany.

We affirm.

## I.

The facts to the date of our previous decision are set forth in our opinion and need not be repeated here. On remand, the government supplemented the existing record with an affidavit of Colonel Hart. In his affidavit, Hart stated that he erred in his previous testimony that he spoke with Colonel Dennis York, Chief of International Affairs for the United States Army, Europe, about whether Burt and Plaster could be transferred back to West Germany for either court martial by the United States Army or whether the West Germans could recall their waiver of jurisdiction and proceed to a West German trial. He now says that his conversation was with Colonel

Al Rakas, then Chief of International Affairs Division, USAREUR, and:

I was told by Colonel Rakas that the State and Defense Departments had decided that to then allow West Germany to recall its jurisdiction after it had failed to do so during the time limit set in the Supplementary Convention would set a bad precedent under the NATO SOFA. I was told that it was the United States Government's policy to assert and maintain jurisdiction whenever possible in situations where both the United States and the receiving country had concurrent jurisdiction.

In addition, Hart denied any awareness that Rakas discussed granting immunity to Plaster with the International Affairs Division of JAGO, asserting that, under the Uniform Code of Military Justice, the Commanding General had discretionary authority to grant immunity from military prosecution. Hart further denied awareness of anyone discussing any extradition treaty between the United States and the Federal Republic of Germany then in force or later to be concluded, other than NATO Status of Forces Agreement (SOFA). He added:

I did not request authority from the International Affairs Division, United States Army, Europe, the State Department, or the Defense Department to offer a grant of immunity to Plaster or to include in such an immunity grant a promise not to extradite him to West Germany. The decision by the Departments of State and Defense, as relayed to me by Col. Rakas, made no mention of my decision to pursue an immunity grant, which was my response to that decision. At the time the grant of immunity was drafted and approved by General Schellman, I did not consider whether the immunity would include immunity from extradition. Therefore, I did not discuss with or ask the approval of General Schellman or anyone to grant immunity from extradition. To the best of my knowledge, I was not delegated any authority by the Department of State to promise Plaster or Burt, as part of any immunity agreement, that the United

States Government would not extradite either Burt or Plaster to West Germany. I did not promise Plaster, as part of the immunity agreement, that he would not be extradited to Germany for the 1965 murder of Kurt Pfeuffer.

Based upon the evidence of Colonel Rakas, the district court made a factual finding that "the State Department, through its liaison, Colonel Rakas, told Hart that a final decision had been made that Plaster would not be extradited [and therefore] Hart had the requisite authority to promise Plaster freedom from extradition." The government also contended before the district court that the decision in *Mabry v. Johnson, supra,* required it to reconsider its initial decision to issue the writ, but the district court ruled that that decision did not have that effect.

## II.

Before us, the government attacks the factual finding that Hart had authority to promise Plaster freedom from extradition, asserting that it is clearly erroneous. It argues that the evidence shows that Hart was informed only that the State and Defense Departments would not accede to a reassertion of the West German government's right to exercise jurisdiction under the NATO SOFA, but that this is far different from advice that "the State Department would not seek enforcement of any extradition request the West German government might make at some time in the future." In that connection, it stresses that the evidence did not show that extradition or immunity from extradition were specifically mentioned or discussed in the communications between Hart and representatives of the Departments of State or Defense.

To this argument we think that there are several answers. In the previous appeal, there was a factual finding that Plaster and his then attorney were both told by Hart's deputy, Colonel Rarick, that under the immunity agreement "Plaster would be prosecuted neither by American nor Ger-

man authorities", 720 F.2d at 345, and this finding was accepted as not clearly erroneous. Since international extradition is a matter committed to the President and his designees, what concerned us in the prior appeal was whether Hart and his deputy had express, implied or apparent authority to commit the government not to extradite Plaster as part of the immunity agreement. We concluded that, given the close ties between extradition and the Executive's power to conduct foreign affairs, a grant of immunity from extradition must be made by one to whom the authority to issue such immunity has actually been delegated. 720 F.2d at 354–55.

■ The evidence adduced on remand clearly showed that the Departments of State and Defense decided not to return Plaster to German jurisdiction upon a recall of West Germany's waiver of jurisdiction, and this discussion was communicated to Hart by Rakas. We think that this is enough to render the district court's finding that Hart had authority to promise Plaster freedom from extradition immune from attack.

■ Although the treaty between the United States and the West German government under which extradition is now sought was not in existence at the time that Plaster entered into the immunity agreement, there was in effect between the two governments a status of forces agreement under which the United States could have ceded criminal jurisdiction to West Germany (by permitting Germany to recall its waiver of jurisdiction), had the United States been so disposed, even though the West German government had initially waived its primary right to exercise its concurrent jurisdiction. It is true, as the government argues, that, under international law, there are technical differences between an extradition treaty and a status of forces agreement. But the fact remains that there was a mechanism to return Plaster to West German criminal jurisdiction when the immunity agreement was entered into by Plaster and the government. There was thus in the broad, generic sense an

"extradition" treaty at that time so that the advice to Hart that neither the Departments of State nor Defense would agree to return Plaster was a sufficient indication that he could promise immunity from extradition in an effort to develop evidence to convict someone of the murder of the taxi driver. That a formal extradition treaty came later into being is of no moment because by then the rights of Plaster had been created and the government could not deprive him of them.

■ We attach no significance to the failure to use the precise term "extradition" in the communications between Hart and the executive branches of the government. It would have been extremely unusual for them to have spoken in terms of a treaty yet to be negotiated and ratified. Extradition is the return of an accused to the place at which he allegedly committed a crime to stand trial on the charges made against him. Certainly this is the substance of what was discussed between Hart and the representatives of the Department of Defense and State. It is a mere matter of semantics as to whether the word "extradition" was used or whether parties spoke of returning Plaster to West Germany for trial.

In sum, we conclude that the finding of the district court that the promise not to extradite was authorized is not clearly erroneous.

### III.

*Mabry v. Johnson, supra,* held that a criminal defendant's acceptance of a prosecutor's proposed plea bargain does not create a constitutional right to have the bargain specifically enforced where the prosecutor withdraws the offer prior to the acceptance of the guilty plea. Stated otherwise, a plea bargain is "a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest", 467 U.S. at 507, 104 S.Ct. at 2546, 81 L.Ed.2d at 442, so that it may be withdrawn. In deciding *Mabry,* the Supreme Court overruled our decision

in *Cooper v. United States*, 594 F.2d 12 (4 Cir.1979), which we cited in the prior appeal in ruling that the immunity agreement gave rights to Plaster as soon as it was made. 720 F.2d at 351–54.

The government argues that an immunity agreement is to be likened to a plea agreement and therefore it may be withdrawn with impunity until the time that the person immunized has acted thereunder to his prejudice by incriminating himself or by giving the testimony against another as promised. The government argues that Plaster did not act under the immunity agreement so that it has remained executory and may be avoided at the government's option.[1]

■ The district court rejected the government's argument, ruling that a plea agreement and an immunity differ markedly so that the holding in *Mabry* is inapposite. We agree. As the district court correctly analyzed:

> [A] grant of immunity is different from a plea bargain in that it can never be formalized by a plea of guilty. On the contrary, the very nature of the agreement is the promise on the part of the government to do nothing. In addition, a grant of immunity differs from a plea agreement in that it in no way involves court approval. In the case of a plea agreement, the court in essence executes the agreement by accepting the plea of guilty. In the case of a grant of immuni-

ty, however, only two parties are involved. The government alone makes a decision not to prosecute in exchange for testimony which will, hopefully, lead to a greater number of indictments or convictions. The most that one granted immunity can do is to agree to testify and then await the call of the government. The fact that the government has never called upon Plaster to testify does not now entitle the government to breach its part of the bargain.

■ For these reasons, we agree that *Mabry* is not dispositive. Further, our reliance on *Cooper*, now displaced by *Mabry*, was not the sole basis for our holding that, if authorized, the immunity agreement in this case was binding on the government. Even if we leave aside the enforceability of immunity agreements generally when the person granted immunity is not called upon to incriminate himself, the special circumstances of this case—the government's decision to proceed by an executory agreement, the fact that the immunity agreement was made in the military context and the fact that more than fifteen years has elapsed between the making of the agreement and the government's attempt to withdraw from it—all lead to the conclusion that it may not be avoided now. Since there is a not clearly erroneous finding that the agreement was authorized, we conclude that the writ of habeas corpus to enforce it properly issued.

AFFIRMED.

---

1. There is, however, evidence in the record that the government's contention may be factually inaccurate. In the habeas corpus proceeding in the district court, Plaster testified that, after he entered into the immunity agreement on the advice of his then counsel, he was interviewed and gave a detailed accounting of all activities in Germany concerning the charges pending against him and that he did so because he understood that he could never be prosecuted for any information that he gave in the statement, but that he would receive a dishonorable discharge. He said that his interrogators represented that they wanted to settle the matter and make payments to the German family involved. While he does not dispute that he never was called upon to testify against his co-defendants, we were told in oral argument that Burt has been tried and convicted in Germany and that Plaster stated his willingness to testify against

him, but Plaster's offer was refused because he asserted his own immunity.

The only evidence to controvert the inescapable inference that Plaster incriminated himself when he gave the requested statement is an affidavit of the Chief, Foreign Claims Branch, U.S. Army Claims Service, that his personnel would not have sought such a statement, and that, if one were sought, would have not discussed immunity from criminal prosecution, and that settlement of claims and criminal prosecutions were unrelated activities. The Chief, however, claims no actual knowledge of what Plaster's interrogators said to Plaster. The district court did not resolve this factual issue, and because of our view of the legal effect of the immunity agreement in this case, we find it unnecessary to remand the case for resolution of the conflict.

WILKINSON, Circuit Judge, concurring separately:

I join in the majority's decision to affirm the judgment, but I cannot agree with the majority's decision to rely in part on "the enforceability of immunity agreements generally when the person granted immunity is not called upon to incriminate himself." *Ante* at 293. This position is both unnecessary and unsound. Unnecessary, because the court recognizes that the extraordinary aspects of Plaster's case independently require issuance of the writ. And unsound, because pledges of immunity—like other prosecutorial contracts—are generally *not* enforceable unless the recipient has performed his obligation and suffered actual prejudice by some self-incriminating act. Only the extraordinary delay between the offer and withdrawal of immunity justifies a contrary result in this case, and I restrict my concurrence to that narrower ground.

If a defendant has not made inculpatory statements on the basis of an offer of immunity, withdrawal of the offer ordinarily will not interfere with the defendant's right to a fair trial. The majority implies that appellate courts may ignore this absence of prejudice and arrest the criminal process simply because government attorneys have repudiated their offer. The Supreme Court has cautioned against this impulse to place the prosecution on trial, *Mabry v. Johnson*, 467 U.S. 504, 511, 104 S.Ct. 2543, 2548, 81 L.Ed.2d 437 (1984) ("The Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty."). So long as the accused has not been prejudiced, the government's etiquette is not dispositive. Irregularities that do not affect substantial rights are to be disregarded. *See United States v. Mechanik*, — U.S. —, —, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986) (and cases cited therein).

The correct approach may be found in this court's leading general statement about the enforcement of immunity agreements: "if the promise was made to defendant as alleged *and the defendant relied upon it in incriminating himself* and others, the government should be held to abide by its terms." *United States v. Carter*, 454 F.2d 426, 427 (4th Cir.1972) (en banc) (emphasis added); *see also Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir. 1985); *Rowe v. Griffin*, 676 F.2d 524, 527–28 (11th Cir.1982). Subject to exceptions like the one presented here, the converse of the *Carter* formulation is equally accurate: if the defendant has not relied upon the promise in incriminating himself, the government should not be held to abide by its terms. *United States v. Calimano*, 576 F.2d 637, 640 (5th Cir.1978); *see also Roe v. United States Attorney*, 618 F.2d 980 (2d Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 152, 66 L.Ed.2d 70 (1980).

These principles have been most clearly articulated in the closely related context of prosecutorial agreements involving guilty pleas. The Supreme Court has refused to enforce such arrangements after the government has repudiated but before the defendant has been prejudiced:

A plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of the court, does not deprive an accused of liberty or any other constitutionally protected interest. It is the ensuing guilty plea that implicates the Constitution.

*Mabry v. Johnson*, 467 U.S. at 507–08, 104 S.Ct. at 2546, *overruling Cooper v. United States*, 594 F.2d 12 (4th Cir.1979). The same analysis applies to a promise to forbear prosecution in order to secure testimony. A grant of immunity standing alone is also "a mere executory agreement" that is "without constitutional significance;" it is the ensuing privileged statement that implicates the Constitution.

The majority tries to avoid *Mabry v. Johnson* by suggesting several purported differences between a plea bargain and a grant of immunity. *Ante* at 293. As purely descriptive propositions, these contrasts suffer from a tantalizing imprecision. Immunity may be "formalized" by an incriminating statement just as a plea agreement is "formalized" by a capitulating statement. Both arrangements might

commit the government to "do nothing" in some sense: to refrain from prosecution, for example, or to abstain from recommendation at sentencing. And the participation of the court will in each situation depend on the nature of the agreement.

More important, the majority advances no reason that these proposed distinctions between an immunity offer and a plea agreement should create any difference in enforcement where the defendant has not prejudiced himself. Nor could the majority bridge this analytic gap, for the principle behind *Mabry v. Johnson* applies equally to the two cases. A grant of immunity, like a plea bargain, sacrifices constitutional protection from self-incrimination in exchange for prosecutorial protection from judicial process. The exchange is in either instance sealed only by the disadvantageous acts of the defendant.

Not surprisingly, courts usually see immunity agreements and plea bargains as a single legal category. In many cases, the two covenants are integrated in one deal. *See, e.g., United States v. Cooper; United States v. Carter; United States v. I.H. Hammerman, II,* 528 F.2d 326 (4th Cir. 1975). In other cases, courts rely explicitly on a single set of interchangeable principles to resolve enforcement issues. *See, e.g., United States v. Brimberry,* 744 F.2d 580, 587 (7th Cir.1984); *United States v. Carrillo,* 709 F.2d 35, 36 (9th Cir.1983); *Rowe v. Griffin,* 676 F.2d at 528. Indeed, this court adopted the same analogy in the earlier appeal in this very case. *Plaster v. United States,* 720 F.2d 340, 351–54 (4th Cir.1983).

The Court's earlier reasoning remains correct today. If we must address "the enforceability of immunity agreements generally where the person granted immunity is not called upon to incriminate himself," *ante* at 293, we should acknowledge that the plea bargain authority is relevant, that *Mabry v. Johnson* will control most cases, and that, without prejudicial reliance, the defendant usually will not be able to hold the government to its offer. But we need not speak so broadly; we need only decide this case. *See Plaster v. United States,* 720 F.2d at 353 ("we of course do not decide whether executory immunity agreements generally are enforceable by the defendant"). And this case presents special circumstances that independently justify issuance of the writ. The government promised Plaster immunity approximately fifteen years ago. During that time he has established a home and pursued a career—he has relied on the immunity in making a new life. Fundamental fairness requires that we recognize the long duration of that reliance. For that reason, I concur in the affirmance of the district court's judgment.