**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Jerry Lee HARVEY,**
**Defendant–Appellee.**

No. 87–5051.

United States Court of Appeals,
Eleventh Circuit.

April 14, 1989.

---

Leonard Alan Sands, Coconut Grove, Fla., for defendant-appellee.

Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, and COX, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellee Jerry Lee Harvey disclosed his illegal activities in the drug trade to Drug Enforcement Administration agents under an unwritten informal grant of immunity in 1980. Four years later a grand jury indicted Harvey for failing to report the interest income earned on the proceeds of those drug-related activities in the years leading up to and following the 1980 grant of immunity. Harvey moved to dismiss the indictment, arguing that the 1980 informal grant of immunity protected him from prosecution. The district court, upon the recommendation of the magistrate, agreed and dismissed the indictment with prejudice. *United States v. Harvey*, 651 F.Supp. 894 (S.D.Fla.1986). The government appealed the dismissal of those counts that charged violations for the years following the grant of immunity. A divided panel of this court affirmed. 848 F.2d 1547 (11th Cir.1988). We determined to rehear this case in banc and vacated the panel opinion. 855 F.2d 1492 (11th Cir. 1988). We now REVERSE the order of the district court dismissing those counts of the indictment that relate to offenses allegedly committed after the grant of immunity to Harvey.

## I. THE FACTS

Roger M. Olsen, Atty. Gen., Michael L. Paup, Chief, Robert E. Lindsay, Alan Hechtkopf, Appellate Section, Tax Division, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

On November 27, 1985 a grand jury in the Southern District of Florida returned an indictment charging Harvey with five counts of income tax evasion for the years 1978 through 1982, in violation of 26 U.S.C.

§ 7201,[1] and one count of filing a false income tax return in April of 1981, a violation of 26 U.S.C. § 7206(1).[2] The government alleges that Harvey kept millions of dollars derived from his lucrative drug dealings in a bank account in the Cayman Islands. In his individual income tax return for the year 1980, however, Harvey denied that he had any proprietary interest in, or authority over, any bank account outside the United States.[3] Harvey also failed to report the interest income he allegedly earned on his Cayman Islands account on his individual income tax returns for the years 1978 to 1982.

Harvey filed a motion in the district court on June 2, 1986 in which he alleged that the government had informally granted him use immunity in return for his cooperation in a drug investigation in 1980. Harvey sought a pretrial hearing to require the government to prove that the evidence it proposed to use at trial was derived from a legitimate source independent of the immunized testimony, as *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), required. The immunity agreement was never reduced to writing, but Harvey was able to point to a letter from the United States Attorney for the Southern District of Alabama acknowledging that Harvey had reached an agreement with the government in 1980.

The government denied that Harvey had been granted any immunity other than a simple agreement not to prosecute him for certain charges pending in Alabama. Because it disputed the very existence of a grant of immunity, the government objected to the holding of a *Kastigar* hearing as unwarranted.

Faced with this disputed claim of an unwritten grant of immunity, the magistrate did not hold a traditional *Kastigar* hearing, as Harvey had requested. Instead, she held a series of "pre-*Kastigar*" hearings in order to determine (1) whether Harvey had been granted immunity in 1980, (2) if so, what kind of immunity the government had granted, and (3) what information Harvey had revealed to the government.

The "pre-*Kastigar*" hearings revealed that in June of 1980 a grand jury sitting in the Southern District of Alabama had indicted Harvey and several others for the attempted importation of a large quantity of quaalude tablets. The government's case against Harvey was indefensible—

---

1. Title 26 U.S.C. § 7201 provides in part as follows:

   Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined ..., or imprisoned not more than 5 years, or both, together with the costs of prosecution.

   The fine for a violation of section 7201 committed before September 3, 1982 is an amount not more than $10,000. For violations committed after that date, Congress has increased the potential penalty to not more than $100,000. Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 329, 96 Stat. 324, 617–18 (1982).

2. Title 26 U.S.C. § 7206(1) provides in part:

   Any person who—
   (1) DECLARATION UNDER PENALTIES OF PERJURY.—Willfully makes and subscribes any return statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation) or imprisoned not more than 3 years, or both, together with the costs of prosecution. As for violations of section 7201, the fine for a violation of section 7206(1) is an amount not more than $10,000 for violations committed before September 3, 1982, $100,000 if committed after that date. Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, § 329, 96 Stat. 324, 617–18 (1982).

3. Harvey answered "no" to the following question: "At any time during the tax year, did you have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, or other financial account)?" *See* U.S. Individual Income Tax Return 1980 (Form 1040), Schedule B, Part III (Foreign Accounts and Foreign Trusts). *See also* 31 C.F.R. §§ 103.24, 103.26(c) (1980) and form TD–F 90–22.1 (requiring each person subject to U.S. jurisdiction to report any interest in a bank account in a foreign country).

"slam dunk" to use the evocative words of Harvey's lawyer at the time. Making the best of the situation, Harvey decided to cooperate with the government.

Although the United States Attorney in the Southern District of Alabama did not need any of the testimony Harvey offered, his counterpart in the Southern District of Florida did. Thus, Harvey was able to reach a three-sided agreement with the government. Although there was some dispute at the *"pre-Kastigar"* hearings about the specific terms of the actual bargain struck between Harvey and the government, the witnesses agreed that the United States Attorney for the Southern District of Alabama offered to dismiss the indictment pending in that district in return for Harvey's cooperation with an investigation that the United States Attorney for the Southern District of Florida was conducting. The United States Attorney for the Southern District of Florida sent several Drug Enforcement Administration ("DEA") agents to Alabama where they interviewed Harvey. Apparently Harvey met his side of the bargain, and the United States Attorney dismissed the indictment against Harvey in the Alabama quaalude case.

The testimony differed sharply as to any further elements of the agreement. After weighing all the evidence, the magistrate found that in addition to agreeing to drop the Alabama indictment, the government had granted Harvey both transactional immunity and use immunity for any information he had revealed to the DEA officials in 1980.

Because the DEA agents who interviewed Harvey had failed to keep any records whatsoever of their conversations with Harvey, the daunting task of reconstructing what Harvey disclosed to the DEA agents in 1980 now faced the magistrate. The magistrate found that Harvey had told the agents about all of the drug deals in which he had been involved before and at the time of his arrest in 1980, and had also "divulged ... his financial dealings with respect to his illegal drug deals." This information included the identification of the funds in the Cayman Islands bank.

Having thus determined what had happened in 1980, the magistrate turned to the 1985 tax evasion indictment. Stephen Snyder, the Justice Department's Criminal Tax Division attorney responsible for the investigation of the government's case and its presentation to the grand jury appeared at the *"pre-Kastigar"* hearings. Snyder testified that the government had used the net worth method of proving to the grand jury that Harvey had substantially underreported his income in the prior years.[4] In addition, the government also introduced documents obtained from the Bank of Nova Scotia in the Cayman Islands showing payment of interest to Harvey during the years in question.[5] Snyder further testi-

**4.** Under the net worth method the government establishes the taxpayer's total assets and liabilities at the beginning of the year and compares them with the taxpayer's assets and liabilities at the end of the year. If the excess of assets over liabilities increases during the year the increase is taxable unless the taxpayer can show that the increase represents nontaxable income. *See, e.g., Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (approving net worth method of reconstructing taxable income under predecessor of current Internal Revenue Code section 446).

**5.** In a separate motion before the district court Harvey sought to have the court exclude these documents which the government had obtained through the "United Kingdom–United States: Agreement Concerning Obtaining Evidence From Cayman Islands With Regard to Narcotics Activities." The gravamen of Harvey's argument is that the United States may obtain evidence from the Cayman Islands under the agreement only when it does so as part of an investigation for narcotics violations. Because the government was investigating him solely for tax evasion, Harvey argues that it could not invoke the provisions of the agreement (even though the corpus of the money was derived from narcotics activity). The district court dismissed the indictment against Harvey before addressing this question; therefore, because this question is not now before us, we do not address it, nor do we address Harvey's standing to raise it.

During oral argument Harvey also suggested that the government must have used the testimony he gave under immunity when it certified to the government of the Cayman Islands—as it had to in order to obtain documentary evidence under the terms of the agreement—that Harvey was involved in narcotics activity. Because we conclude that the government is entitled to

fied that he told the grand jury that the probable source of Harvey's income was his drug-related activities.

The magistrate did not allow the government to show that it had derived the evidence it presented to the grand jury—or that it intended to introduce at trial—from legitimate independent sources. The hearing transcript, currently under seal, reveals conclusively that Snyder began to testify about the trail that led to Harvey's Cayman Islands bank account, but upon the objection of Harvey's counsel, the magistrate stopped Snyder from testifying further. The magistrate considered such information irrelevant to the "pre-*Kastigar*" hearing; instead, the magistrate reasoned that whether the government derived the information leading to the indictment from independent sources was properly a matter only for a true *Kastigar* hearing.

With the findings of fact set out, the magistrate then made a "Finding of Law" in which she concluded that the information concerning Harvey's drug activities and related financial dealings formed the basis for the tax indictment and was "inextricably tied" to the information that Harvey had revealed to the DEA agents in 1980. Even though she had refused the government the opportunity to demonstrate that the evidence against Harvey came from a source independent of the immunized testimony, the magistrate concluded that the evidence presented to the grand jury was "tainted." The magistrate further concluded that the indictment violated the grant of immunity extended to Harvey and recommended that the district court dismiss the indictment.

The district court reviewed the record *de novo* and agreed with the magistrate's factual finding that the government had extended both use and transactional immunity to the appellee. The district court dismissed the indictment with prejudice.

prove that it derived the evidence against Harvey from sources independent of the immunized testimony, we need not address this.

6. Thus, the government at least implicitly has come to recognize that the 1980 immunity agreement bars any prosecution for tax evasion allegedly committed before September of 1980

For the purposes of this appeal the government does not dispute the factual findings of the magistrate and district court that Harvey received transactional and use immunity in 1980 and that he told the DEA agents about his financial dealings, including the existence of the funds in the Cayman Islands. The government, however, vigorously disagrees with the legal conclusion that such a grant of immunity given in 1980 bars Harvey's prosecution for failure to report the existence of a foreign bank account or the interest earned on that account in years after that grant of immunity.[6]

## II. INFORMAL GRANTS OF IMMUNITY

We note at the outset that this appeal would not be necessary had the United States Attorneys for the Southern Districts of Alabama and Florida reduced their agreement with Harvey to writing. The magistrate and district court have been put through the arduous task of reconstructing the terms of the agreement with the government, a task made still more difficult by the astonishing failure of the DEA agents who interviewed Harvey to keep any written records of those interviews. Informal grants of immunity are by their very nature less certain than formal grants, and thus are much more likely to create confusion for the government and for the courts in the future. As long as prosecutors continue the practice of unwritten grants of immunity, they open the door for subsequent litigation such as this, and for adverse decisions as well.

■ Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes. *See Mabry v. Johnson,* 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) (plea agreement); *Santobello v. New York,* 404

(the date of the immunity agreement), or any other legal action, such as forfeiture, that might arise from violations that allegedly took place before the immunity agreement. Harvey got a fresh start in 1980, including his Cayman Islands money.

U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) (plea agreement); *In re Arnett*, 804 F.2d 1200 (11th Cir.1986) (plea agreement); *Rowe v. Griffin*, 676 F.2d 524 (11th Cir. 1982) (immunity); *United States v. Weiss*, 599 F.2d 730, 737 (5th Cir.1979) (immunity) (Tuttle, J.) ("To protect the voluntariness of a waiver of fifth amendment rights, where a plea, confession, or admission is based on a promise of a plea bargain or immunity, the government must keep its promise."). *See also Plaster v. United States*, 789 F.2d 289 (4th Cir.1986) (immunity); *Johnson v. Lumpkin*, 769 F.2d 630 (9th Cir.1985) (plea agreement); *United States v. Carter*, 454 F.2d 426, 427 (4th Cir.1972) (in banc) (immunity) ("if the promise was made to defendant as alleged and the defendant relied upon it in incriminating himself, the government should be held to abide by its terms"). This is true because by entering into a plea agreement the defendant forgoes his important constitutional right to a jury trial, or by testifying under a grant of immunity he forgoes his fifth amendment privilege. In either case courts will enforce the agreement when the defendant or witness has fulfilled his side of the bargain.

■ Although federal law no longer provides for formal, statutory grants of transactional immunity,[7] a prosecutor may, as in this case, informally grant transactional immunity to a witness in return for his cooperation in a criminal case. Similarly, although 18 U.S.C. §§ 6002–6003 provide for court-supervised grants of use immunity, prosecutors may extend such immunity informally as well. Harvey did not receive a formal (statutory) grant of transactional or use immunity, yet because due process requires us to enforce the government's agreement with Harvey, we apply the same rules and method of analysis to an informal grant of use or transactional immunity as we would to a formal grant.[8] *E.g., United*

*States v. Quatermain*, 613 F.2d 38, 41 (3d Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). We will examine each in turn.

## III. USE IMMUNITY

The first issue we address is the effect the 1980 grant of use immunity has on the current prosecution for tax evasion. This question is essentially evidentiary in nature. As we discuss below, the government may not use, either directly or derivatively, any testimony Harvey gave under the 1980 grant of use immunity against him in a subsequent related prosecution. We discuss in a separate section the analytically distinct question of whether the government may *ever* prosecute Harvey for tax evasion. Resolution of that question depends on the scope of the 1980 grant of *transactional* immunity Harvey received.

■ Use immunity prohibits the use of compelled testimony, or any evidence derived directly or indirectly from that testimony, against the witness in a criminal prosecution. *See generally Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In contrast to transactional immunity, use immunity does not prohibit the government from prosecuting the witness for crimes about which he testified, provided the government proves that it has other evidence to support the prosecution that "is derived from a legitimate source wholly independent of the compelled testimony." *Id.*, 406 U.S. at 460, 92 S.Ct. at 1665. Pursuant to Title 18 U.S.C. §§ 6002–6003, a district court may formally grant use immunity to a witness who refuses to testify on the basis of his fifth amendment privilege, or, as here, a prosecutor may informally grant use immunity to a witness in return for his cooperation in a criminal case. When a defendant has dem-

---

**7.** As a part of the Organized Crime Control Act of 1970 Congress added the current scheme for statutory grants of use immunity, currently codified at 18 U.S.C. §§ 6001–6005, and repealed several other immunity statutes, including transactional immunity provisions, that had been scattered throughout the United States

Code. Pub.L. No. 91–452, §§ 201–260. 84 Stat. 922 (1970).

**8.** We note that the government has not alleged that Harvey in some way failed to meet his end of the bargain. Therefore, our task is simply to enforce the agreement with Harvey.

onstrated that he testified under a grant of use immunity, the burden shifts to the prosecution which then has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent" of the testimony given under the grant of immunity. *See Braswell v. United States,* — U.S. —, 108 S.Ct. 2284, 2295, 101 L.Ed.2d 98 (1988); *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665. *See also Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964).

The government contends that it derived the evidence it used to secure Harvey's indictment by the grand jury and the evidence it intended to use at trial, from an independent source. In essence, the government claims that while investigating someone else the Criminal Tax Division of the Justice Department came upon a trail of evidence that led to Harvey's bank account in the Cayman Islands.

As we noted above, the record reveals that the magistrate did not permit the government to show the independent sources of its evidence against Harvey. The magistrate recommended that the indictment be dismissed after having conducted only the "pre-*Kastigar*" hearing. Similarly, the district court dismissed the indictment in part because it believed that all of the government's evidence was given under the 1980 grant of immunity. Yet such a conclusion was premature without giving the government the opportunity to meet its burden under *Kastigar* of proving the independent source of its evidence. For the same reason, any conclusion that tainted evidence sufficient to justify dismissing the indictment was presented to the grand jury was also premature because the government may have been able to demonstrate that the evidence was not tainted at all.

## IV. TRANSACTIONAL IMMUNITY

### A.

■ The more difficult issue in this appeal is whether the transactional immunity Harvey received in 1980 prohibits the government from prosecuting him for tax violations committed *after* that grant of immunity. We conclude that it does not.

■ Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates." *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed. 2d 212 (1972).[9] The purpose of a grant of transactional (or use) immunity is to preclude a witness's reliance on his fifth amendment privilege against compelled self-incrimination: the government may compel a witness to testify by granting him immunity, provided that the scope of the immunity is at least as great as that of the fifth amendment privilege that the witness must forego. *See Kastigar v. United States,* 406 U.S. at 449, 92 S.Ct. at 1659; *Counselman v. Hitchcock,* 142 U.S. 547, 564, 586–87, 12 S.Ct. 195, 198, 206, 35 L.Ed. 1110 (1892). As such, in deciding the scope of a grant of immunity the Supreme Court traditionally has referred to the scope of the fifth amendment privilege itself.

For example, in *Heike v. United States,* 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913) (Holmes, J.), the Court refused to construe broadly a transactional immunity statute that provided that "no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under [the interstate commerce and anti-trust acts]." *Heike,* 227 U.S. at 141, 33 S.Ct. at 227 (quoting Act of February 25, 1905, ch. 755, 32 Stat. 904). The Court saw "no reason for supposing that the act offered a gratui-

**9.** Transactional immunity statutes typically provided that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise ..." *Kasti-* gar v. United States, 406 U.S. 441, 451, 92 S.Ct. 1653, 1660, 32 L.Ed.2d 212 (1972) (quoting from Compulsory Testimony Act of 1893, which served as a model for numerous federal immunity statutes).

ty to crime." *Id.* at 142, 33 S.Ct. at 228. Instead, the Court reasoned that a grant of immunity "should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned." *Id.,* 33 S.Ct. at 228. *See also Shapiro v. United States,* 335 U.S. 1, 19, 68 S.Ct. 1375, 1385, 92 L.Ed. 1787 (1948) (following rule of construction of *Heike* ). More recently, in *Kastigar,* the Court upheld the constitutionality of 18 U.S.C. § 6002 on the ground that use immunity "is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." 406 U.S. at 453, 92 S.Ct. at 1661.

The Court noted in *Kastigar* that transactional immunity is broader than the fifth amendment privilege because it provides for full immunity from future prosecution, while the fifth amendment privilege "has never been construed to mean that one who invokes it cannot subsequently be prosecuted." *Id.* Yet the Court has never indicated that transactional immunity is in any other respect broader than the fifth amendment privilege. Thus, transactional immunity and use immunity are coterminous with the fifth amendment privilege in all respects other than their effect on the government in the future. A grant of use immunity prohibits the government from using evidence disclosed either directly or derivatively, while a grant of transactional immunity prohibits the government from prosecuting the witness at any time with respect to the incriminating matters the witness disclosed.

Although *Kastigar* and *Heike* were cases in which the witness refused to testify, and thus the Court had to look to the scope of the fifth amendment privilege in order to determine whether the proffered immunity sufficed to displace that privilege, we believe the same principles apply to the case before us now. The magistrate found as a fact, and the district court affirmed her finding, that the government extended use and transactional immunity to Harvey in return for his cooperation, i.e., his testimony. Absent any factual finding to the contrary, we believe it proper to conclude that this grant of immunity was fully as broad as the fifth amendment privilege that Harvey gave up when he disclosed his illegal activities to the DEA agents. By the same token, we believe that—absent any contrary factual finding—we should not conclude that the scope of the immunity Harvey received was any greater than that of the fifth amendment privilege he gave up.[10] Thus, Harvey received transactional and use immunity for any testimony as to which he could have invoked his fifth amendment privilege in September of 1980.

With this in mind, we turn now to the issue of when may a witness invoke his fifth amendment privilege with respect to a crime he has not yet committed.

## B.

■ In general, the privilege against self-incrimination only prohibits compelled testimony that might incriminate a witness for crimes he had already committed, or was in the process of committing, at the time the testimony was given. *See Counselman,* 142 U.S. at 562, 12 S.Ct. at 198 (purpose of privilege is "to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself *had committed* a crime") (emphasis added); *United States v. Quatermain,* 613 F.2d 38, 42 (3d Cir.), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). Twenty years ago, however, the Supreme Court rejected a rigid chronological test under the fifth amendment privilege, focusing instead on the substantiality of the risk the witness faced.

---

10. We note that neither the magistrate nor the district court found that the plea agreement included anything other than the dismissal of the Alabama indictment and the grant of use and transactional immunity. Nor does Harvey suggest during this appeal that his agreement involved anything more. Thus, we are working solely with the familiar categories of transactional and use immunity, and do not face any different "species" of immunity—e.g., an express agreement not to prosecute for future tax violations with respect to the Cayman Islands funds.

In *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) the Supreme Court held that the fifth amendment privilege was not entirely inapplicable to prospective acts. The petitioner in *Marchetti* was convicted of violating provisions of a statute that required professional gamblers to register annually with the Internal Revenue Service and pay an occupational tax. The Court, overruling a prior case that had upheld the very same statute, *United States v. Kahriger*, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), held that the petitioner's assertion of his fifth amendment privilege in refusing to comply with the statute provided a complete defense to his prosecution for failing to register and pay the occupational tax.[11]

*Marchetti* explicitly rejected the notion that the fifth amendment privilege offers protection only as to past and present acts. 390 U.S. at 53, 88 S.Ct. at 705. Instead, the Court emphasized that "[t]he central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Id.*, 88 S.Ct. at 705. Relying on this standard, the Court held that the hazards of incrimination created by the registration and occupational tax provisions as to future acts were not "trifling or imaginary" because prospective registrants could reasonably expect that compliance with these provisions "may serve as decisive evidence that they have in fact subsequently violated state gambling prohibitions." *Id.*, 88 S.Ct. at 706.

Although application of this standard proved favorable to the petitioner in *Marchetti*, the Court stressed that this would not usually be the case, as prospective acts "will doubtless ordinarily involve only speculative and insubstantial risks of incrimination." *Id.* at 54, 88 S.Ct. at 705. Thus, although *Marchetti* created an exception to the general rule that the fifth amendment privilege applies only to past and present criminal acts, the exception is a very narrow one.

In *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Court emphasized the narrowness of the fifth amendment privilege's application to future conduct. In *Freed*, the Court rejected the argument that a registration requirement of the National Firearms Act violated the fifth amendment because the information disclosed could be used in connection with offenses that the transferee of the firearm might commit in the future. In so doing, the Court stated:

> Appellee's argument assumes the existence of a periphery of the Self–Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self–Incrimination Clause such an expansive interpretation.

*Id.* at 606–07, 91 S.Ct. at 1117. Thus, *Marchetti* and *Freed* teach that the focus of inquiry under the fifth amendment is whether the witness faces a substantial risk of incrimination. When the witness has not yet committed the crime, or is not in the process of committing it, his risk of incrimination is generally so speculative as to remove him from the aegis of the fifth amendment privilege.

Lower court opinions also make clear that the fifth amendment privilege rarely will apply to future conduct. For example, in *United States v. Quatermain*, 613 F.2d 38, 42–43 (3d Cir.), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980), the court noted that *Marchetti* did not support the defendant's argument that the fifth amendment privilege applies to a witness who refuses to testify because he asserts that his testimony somehow may be

---

**11.** *Marchetti* also overruled *Lewis v. United States*, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), which had held that the wagering tax provisions did not violate the fifth amendment privilege because they were not compulsory. According to the *Lewis* Court, "[t]he only compulsion under the Act is that requiring the deci-

sion which would-be gamblers must make at the threshold. They may have to give up gambling, but there is no constitutional right to gamble. If they elect to wager, though it be unlawful, they must pay the tax." 348 U.S. at 422–23, 75 S.Ct. at 418.

used to incriminate him in a prosecution for a different type of criminal act that he may commit in the future. Accordingly, the court held that the defendant's testimony under an informal grant of use immunity about his involvement in a drug ring did not prevent the government from indicting him for subsequently manufacturing a gun silencer, even though the district court found that the defendant's immunized testimony had helped lead to the indictment on the gun charge. *See also United States v. Gallo*, 859 F.2d 1078, 1088 (2d Cir.1988) (Van Graafeiland, J., concurring) ("Licensing and taxing statutes aside, the only hazards of incrimination that are likely to be considered substantial and real are those which relate to existing or past misdeed or a continuing course of criminal activity.").

## C.

When we apply these principles to the case at hand, we see that the information Harvey revealed to the DEA agents in September of 1980 could not have created substantial and real hazards that it would incriminate him for tax crimes he later allegedly committed in April of 1981, 1982 and 1983. Counts three through five of the indictment charged Harvey with evasion of income taxes for the years 1980, 1981, and 1982, offenses that could not have occurred until April of 1981, 1982, and 1983, when Harvey filed his tax returns for the preceding years.[12] Furthermore, the crime of willfully filing a false tax return for income earned in 1980, as charged in count six of the indictment, could not have occurred until April of 1981 when Harvey filed the allegedly fraudulent return.[13] Thus, although the crimes charged in counts three and six of the indictment related to Harvey's 1980 taxes, the immunity granted in

1980 did not apply to these crimes, because they did not occur until April of 1981, well after immunity was granted.

According to his testimony at the pre-*Kastigar* hearing, Harvey had revealed to the DEA agents that he had deposited millions of dollars, earned through illegal drug transactions, into his accounts at the Nova Scotia Bank in the Cayman Islands. He also told the agents how he set up corporations in the Cayman Islands to launder drug money. In September of 1980, the defendant could not have had "substantial and real" fears that this information would incriminate him for evasion of taxes on interest income that either was not yet required to be reported or had not yet been earned, or for filing a false income tax return that was not due for months to come.[14] Harvey could not have asserted his fifth amendment privilege with respect to these matters, therefore they are outside the scope of the immunity he received in 1980.

Put another way, each failure to report income and each failure to disclose the Cayman Islands account was a separate *transaction*, in the eyes of the law separable from the transactions for which Harvey received immunity. Harvey had a right by contract to receive the interest income on his money, a right he presumably could have enforced in a Cayman Islands court. Similarly, each year Harvey's failure to report the interest on the foreign account was a separate transaction. The duty to report the existence of the foreign bank account in April of 1981, was a separate transaction, unrelated to what had gone before. The mere fact that Harvey failed to disclose funds the existence of which he had disclosed under a grant of

---

**12.** *See Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965) (violation of 26 U.S.C. § 7201 does not occur until the defendant commits an affirmative act constituting an evasion or attempted evasion of the tax).

**13.** *See United States v. Bishop,* 412 U.S. 346, 357–58, 93 S.Ct. 2008, 2016, 36 L.Ed.2d 941 (1973).

**14.** Even if Harvey was certain that he intended to conceal the existence of the Cayman Islands money and the interest earned there from his future tax returns, that would not suffice to make the threat of future prosecution "real and substantial." A witness may not say under a grant of immunity, "I am an inveterate tax cheat," and later claim immunity from any future tax violations. The law will not deem his risk of incrimination substantial because the law expects him to be honest in the future.

immunity does not alter the independent duty Harvey had to report his income accurately.

We must reject Harvey's argument that the 1980 grant of transactional immunity somehow shielded the Cayman Islands funds themselves from the reach of the tax laws.[15] There is no such thing as *in rem* immunity. Harvey became immune from prosecution for those transactions about which he testified, but the money he disclosed did not somehow partake of this immunity. The grant of transactional immunity the government extended to Harvey in 1980 does not prohibit prosecution for tax violations he allegedly committed in the years following that grant of immunity.

## V. CONCLUSION

For the reasons we have stated above, we REVERSE the decision of the district court and REMAND for proceedings consistent with this opinion.

CLARK, Circuit Judge, dissenting:

The majority has written a well reasoned opinion on the scope of formal statutory immunity. Insofar as the court holds that under a formal grant of immunity, an individual is shielded from prosecution only to the extent of his Fifth Amendment privilege, I believe it correctly states the law. Unfortunately, this case does not involve formal statutory immunity. Instead, this case involves an agreement between the defendant and the prosecutor in which the prosecutor agreed not to prosecute the defendant in return for his cooperation. Not only does the majority fail to recognize the fundamental difference between the two forms of immunity, it assumes that the same rules apply to formal and informal immunity. Since the same principles do not apply, I dissent. To understand why the analysis of the majority is erroneous, it is necessary to understand the various forms of "immunity." Only with that understanding it is possible to apply the correct analysis to the case at hand.

## I

In two key sections, the majority states that the same rules apply to formal and informal immunity. *Supra* at 1444, 1446. Specifically the majority holds that the scope of any grant of immunity is defined by the Fifth Amendment. Before explaining this error, it is necessary to understand the difference between transactional and use immunity as well as the difference between formal and informal immunity. Transactional immunity "accords full immunity from prosecution for the offense to which the compelled testimony relates." *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). Use immunity, on the other hand, is more limited; it protects the individual from prosecution through the use of the immunized testimony or evidence derived from that testimony. Therefore, while transactional immunity prohibits any future prosecution, use immunity only limits the government's manner of proof in a subsequent prosecution. This distinction is significant in this case because the magistrate found that the government granted Harvey "transactional immunity" or full immunity from prosecution. As the majority correctly states, the issue in this case is the scope of that "transactional immunity." The majority holds that the scope is coextensive with the Fifth Amendment privilege. To understand why the majority is incorrect, it is necessary to understand the distinction between formal and informal immunity. Because the two forms of immunity come from different sources, the scope of each type of immunity differs.

Formal or statutory immunity is set out in 18 U.S.C. § 6001 *et seq.* Immunity is granted by a court upon the U.S. Attorney's request when a witness refuses to testify before a grand jury or at trial based

---

**15.** Whether Harvey himself reasonably believed this is a matter for the jury, which under 26 U.S.C. §§ 7201 and 7206(1) must find that he wilfully violated the reporting requirements of the tax code. *See* supra, notes 1 & 2. We need not address the reasonableness of Harvey's belief.

on his Fifth Amendment privilege against self-incrimination. 18 U.S.C. § 6003(a). The statute authorizes the granting of "use" and derivative use immunity. 18 U.S.C. § 6002. Several points are noteworthy. First, a United States Attorney does not have the power to grant formal immunity. Instead, he must first subpoena a witness and if the witness invokes the Fifth Amendment privilege, the prosecutor must obtain approval by the Attorney General or Deputy Attorney General and then request the court to order the witness to testify. 18 U.S.C. § 6003.[1] Second, the statute only authorizes use immunity, not transactional immunity. Third, since formal immunity is granted to overcome a witness' invocation of the Fifth Amendment, the Supreme Court has held that the scope of the immunity granted must be as broad as the privilege. *Kastigar,* 406 U.S. at 450, 92 S.Ct. at 1659.

Due to the cumbersome requirements of obtaining properly authorized statutory immunity, U.S. Attorneys often make informal agreements with individuals in return for their cooperation. *See United States v. Quatermain,* 613 F.2d 38, 45 (3d Cir.) (Aldisert, J., dissenting), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The agreements are perfectly analogous to plea agreements: an individual with valuable information bargains with the prosecutor with respect to pending charges in return for that individual's cooperation. A usual condition of cooperation is that the individual not be subject to prosecution for any of the information he provides. *See id.* A prosecutor's power to grant informal immunity derives from his inherent discretion over prosecuting cases; just as a prosecutor has the discretion to plea bargain, he has the discretion to grant an individual immunity from prosecution. We have held that "due process requires the prosecutor's promise to be fulfilled." *Rowe v. Griffin,* 676 F.2d 524, 528 (11th Cir.1982); *see also Plaster v. United States,* 789 F.2d 289, 293 (4th Cir.1986); *United States v. Fountain,* 776 F.2d 878, 882 (10th Cir.1985); *United States v. Carter,* 454 F.2d 426, 428 (4th Cir.1972).

This practice has been dubbed "informal immunity," "hip pocket immunity," *see Quatermain,* 613 F.2d at 45, or "equitable immunity." *Rowe,* 676 F.2d at 526. Additionally, since the prosecutor often agrees not to prosecute at all, these agreements are sometimes carelessly labeled "transactional immunity." *See Rowe,* 676 F.2d at 526 (since prosecutor promised Rowe there would be no subsequent prosecution, court stated he was offered "transactional immunity"). All these terms are unfortunate misnomers because they lead to confusion with formal statutory immunity. Such confusion ignores the fact that the two types of immunity derive from totally different sources and that the source of the immunity determines the scope of a specific grant of immunity. For example, 18 U.S.C. § 6002 only authorizes *use* immunity. More importantly, because statutory immunity is granted to avoid reliance on the Fifth Amendment privilege, the scope of immunity must be coextensive with the Fifth Amendment privilege. The Fifth Amendment only protects an individual against divulging information about future conduct if he faced a substantial risk of incrimination as to those events at the time. *See United States v. Freed,* 401 U.S. 601, 603, 91 S.Ct. 1112, 1115, 28 L.Ed.2d 356 (1971) (firearm registration requirement did not violate Fifth Amendment); *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968) (tax registration requirements violated fifth amendment because registrants could expect provisions to serve as evidence of violation of gambling laws). It therefore follows that under a formal grant of immunity, a witness is only immunized with respect to conduct if he faced a substantial risk of incrimination as to those events when he testified.

In cases of informal immunity, however, the scope of the immunity is not limited by

---

1. Immunity is only available when the testimony is necessary to the public interest and the individual has refused or is likely to refuse to testify on the basis of the privilege. 18 U.S.C. § 6003.

the Fifth Amendment. As Judge Fay has pointed out,

> under the self-incrimination clause of the fifth amendment, evidence of guilt induced by a government promise of immunity is 'coerced' evidence and may not be used against the accused. For purposes of compelling testimony which otherwise would be privileged by the fifth amendment, all that is constitutionally required is a grant of use immunity. *However, in order to secure testimony, evidence or other cooperation from a potential criminal defendant, a prosecutor may see fit to promise complete immunity from prosecution.*

*Rowe,* 676 F.2d at 527 (emphasis added). *Rowe* holds that the government must offer at least use immunity when an individual is induced to cooperate, but that there is no limit to what the defendant can demand in return for his cooperation. *See Quatermain,* 613 F.2d at 45 (Aldisert, J., dissenting) ("[T]he United States Attorney is at liberty to impose conditions that usually relate to testifying or providing certain information. For his part the ... informant often imposes conditions of his own, usually relating to agreements not to prosecute but often covering other matters as well[.]"). If the potential informant demands too much, the government may decide that the information is not worth the price or the government can always subpoena the potential informant to testify before a grand jury or at the trial thereby ensuring that the informant is only granted use immunity. This discussion illustrates that the scope of an informal grant of immunity depends on the bargain struck.

The majority therefore is incorrect to assume the same principles apply to determining the scope of formal and informal immunity. In determining that the Fifth Amendment defines the scope of a grant of *informal* immunity, the majority ignores the cited quotation from *Rowe.* The only case the majority cites as support for its

conclusion is *United States v. Quatermain,* 613 F.2d 38 (3d Cir.1984). Unfortunately, in *Quatermain,* the court specifically held that the informant was granted "the *minimum* immunity required by the Constitution"—that is, *use* immunity. *Id.* at 38 (emphasis added). Therefore, the fact that the agreement provides use immunity made the Fifth Amendment case law relevant, not the fact that it was an informal grant of immunity.

*Rowe* provides the appropriate analysis to apply in cases of informal immunity. In *Rowe,* the court considered a prosecutor's agreement not to prosecute a Ku Klux Klan informant in return for the information he provided the state concerning a murder during the Selma to Montgomery Civil Rights March. 676 F.2d at 525.[2] The court held that such an agreement must be enforced when the defendant proves that an agreement was made, that he performed his side and that the prosecution was directly related to the assistance the defendant had given. The court specifically analogized to the case law on plea agreements and held that "as a matter of fair conduct, the government [must] honor such an agreement[.]" *Id.* at 527.

It follows then that the case law concerning the interpretation of plea agreements is relevant to the interpretation of this type of an agreement made by the prosecutor. *See id.* at 528 ("this contractual analysis applies equally well to promises of immunity from prosecution"). This court interprets a plea agreement consistently with what the defendant reasonably understood when he entered the plea. *In re Arnett,* 804 F.2d 1200, 1201–02 (11th Cir.1986). The court first determines whether the written agreement is ambiguous on its face. If the agreement is unambiguous and there is no allegation of government overreaching, the court will enforce the agreement according to its plain words. *United States v. (Michael) Harvey,* 791 F.2d 294, 300 (4th Cir.1986). If the agree-

**2.** In 1965, the state Attorney General agreed not to prosecute Rowe in return for his testimony at the grand jury and at trial. After new information arose that Rowe might have lied about whether he actually fired any of the fatal shots, the state attempted to prosecute him for murder. Rowe brought suit under 42 U.S.C. § 1983 to enjoin the state prosecution. 676 F.2d at 525–26.

ment is ambiguous, the ambiguity "should be resolved in favor of the criminal defendant." *Rowe*, 676 F.2d at 526 n. 4 (ambiguity over whether Attorney General's promise bound future Attorney General was resolved in favor of the defendant); *see In re Arnett*, 804 F.2d at 1203 (government breached the agreement when it sought forfeiture of defendant's farm since written agreement ambiguous as to whether government would seek forfeiture of property and government could not satisfy heavy burden of proving defendant understood government reserved right to seek property forfeiture): *United States v. (Michael) Harvey*, 791 F.2d at 301 (imprecision in terms of written agreement construed against the government).

## II

In this case, Harvey was not granted formal statutory immunity. He was never called to testify and never invoked his Fifth Amendment privilege. If he had been granted statutory immunity, a discussion of the scope of Harvey's Fifth Amendment privilege would be relevant. Instead, Harvey bargained with the government. In return for the information he provided, the government agreed to drop the charges against him in Mobile and agreed not to prosecute him for any crimes related to the information he gave. There is no doubt that Harvey entered an agreement with the government and that he performed his side. The crux of this case, therefore, depends on an interpretation of the agreement not to prosecute.

The magistrate reconstructed the agreement and found that Harvey had been granted both "transactional" and "use" immunity for the information he provided. The magistrate also determined that Harvey had told the government about the Cayman Islands funds. The majority apparently takes comfort from this finding, stating "we are working solely with the familiar categories of transactional and use immunity, and do not face any different 'species' of immunity—e.g., an express agreement not to prosecute for future tax violations with respect to the Cayman Is-

lands." *Supra* at 1446 n. 10. Indeed as I read the majority opinion, its holding that Harvey's immunity is only as broad as the fifth amendment is *explicitly* dependent on this factual finding. *See supra* at 1446 ("By the same token, we believe that—*absent any contrary factual finding*—we should not conclude that the scope of the immunity Harvey received was any greater than that of the fifth amendment privilege he gave up.") (Emphasis added). I find this statement incomprehensible since the only "species of immunity" the prosecutor was *authorized* to grant was an agreement not to prosecute. Additionally, the magistrate's use of the terms "transactional" and "use" immunity should not be given such great weight since the term "transactional" immunity has been used by this court to describe an agreement not to prosecute. *See Rowe*, 676 F.2d at 526; *Quatermain*, 613 F.2d at 44 (Aldisert, J., dissenting) (although the district court phrased its discussion in terms of transactional and use immunity, analyzing it as an agreement not to prosecute leads to same result). Furthermore, it is clear from the magistrate's opinion that although she used the terms "transactional" and "use" immunity, she understood the critical distinction between formal and informal immunity. In rejecting the government's argument that it had no power to grant "transactional" immunity, the magistrate held

> what the government confuses with respect to immunity is the court's power under 18 U.S.C. 6001 *et seq.* to force an unwilling defendant to testify versus the government's virtually unbridled discretion to plea bargain with any defendant as to terms offered by the government. With respect to § 6001 immunity, the court can compel a defendant to testify, but can *only* grant him use and not transactional immunity. On the other hand, the executive branch can grant transactional immunity in the form of a bargain and does not need the blessing of the court to do so.

Record, Vol. 3, Tab 72 at 22. Indeed, the magistrate applied the principles applicable to plea agreements to what she described "transactional" immunity. Therefore, de-

spite the majority's wishful thinking, we are dealing with an agreement not to prosecute.

In this case, the government never wrote down the terms of the agreement. Additionally, there is no record of the information Harvey provided. Clearly the written terms of the agreement would be the starting place for determining the scope of immunity Harvey was granted. Due to the government's gross negligence, however, we are forced to reconstruct the terms of the agreement.[3] In order to do so, the court must look to the testimony of those involved in negotiating the agreement to determine what Harvey believed the agreement provided and whether Harvey's expectations were reasonable.

Jerry Harvey testified that the government "agreed nothing I ever give [sic] them would be used against me, nor would any U.S. Attorney's Office seek to prosecute me for anything; that I was just getting a clean walk, and I should stay on the Government's side and help them." Record Vol. 3, Tab 72 at 14. Harvey's attorney, Tom Haas, testified that "the understanding I had with [the government] was that nothing that Jerry Harvey said to them, or any agent on the Government would ever at any time be used against Jerry Harvey." *Id.* at 15. This testimony supports Harvey's argument that he believed he was immune from *any* prosecution related to the information he gave. Significantly, no testimony by either of the prosecutors involved in the negotiations rebutted Harvey's broad interpretation of the agreement. In response to a question by the court, the U.S. Attorney for the Southern District of Alabama, William Kimbrough, testified that Harvey was

given use, immunity but that he did not know whether or not he was given transactional immunity. Finally, the prosecutor most intimately involved with the agreement, Patrick Sullivan, an Assistant U.S. Attorney in the Southern District of Florida had no recollection of *any* involvement with Jerry Lee Harvey.[4] He could not remember speaking to the Mobile U.S. Attorney's office or having any negotiations with Harvey.

The court must interpret an agreement consistently with the defendant's reasonable interpretation of the agreement. In this case, the government has failed to offer any evidence to disbelieve Harvey's view of the agreement. Instead, the government argues that it was unreasonable for Harvey to believe that the agreement would shield him from prosecution for future tax violations relating to the Cayman Islands funds. I do not agree. It is not at all clear that a lay citizen would understand that a government's agreement not to prosecute for anything related to the Cayman Islands funds would not preclude prosecution for failure to declare interest from those funds. In addition, since we have no record of the agreement we have no way of knowing what the government officials represented to Harvey as the terms of the agreement. In the absence of some evidence that Harvey knew the agreement would not cover these crimes,[5] I cannot accept the government's position. *See (Michael) Harvey,* 791 F.2d at 300 (due process requires holding government to a greater degree of responsibility for ambiguity in plea agreement than defendant). Furthermore, to the extent that the government's argument is based on the belief the

---

3. I emphasize this point because the majority suggests, *supra* at 1442–1443, that the only problem is that there is no record of the information provided by Harvey. While that omission is important, it is equally problematic (and ultimately decisive in my mind) that there is no record of the terms of the agreement.

4. This is despite the fact that a letter from Mr. Sullivan was introduced in which he asked a state prosecutor to consider the fact that Harvey had cooperated with both the U.S. Attorney and the Drug Enforcement Agency. Additionally,

Mr. Sullivan was unable to recall having used Harvey as a witness in a case in which he was the trial prosecutor some three to five years before the agreement.

5. I emphasize the narrowness of such a holding. The terms of the agreement, *if preserved,* might have contradicted Harvey's interpretation. Even if the agreement was ambiguous, a transcript or even notes of the negotiations might have shown that Harvey's position is unreasonable.

government had no authority to enter the agreement as Harvey perceived it because it granted immunity for future crimes, it is not persuasive. First, it is not apparent that Harvey would know that the government did not have the power to enter the agreement as he perceived it. Second, that argument ignores the possibility that the government may have lead Harvey to believe (or at least contributed to his misunderstanding) that the agreement offered such immunity. Finally, this court has never refused to enforce a plea agreement just because the government made a bad deal.

I would therefore hold that the government agreed that it would not prosecute Harvey with respect to the Cayman Islands funds and that Harvey believed that he would not be prosecuted for failing to report the interest on the Cayman Islands funds. This does not mean that Harvey was immunized from declaring the interest. Quite the contrary, I believe that Harvey was required to pay taxes on the interest and that the government may collect those back taxes. It may not, however, *criminally prosecute* Harvey for failing to report his interest. I also do not believe that the agreement forever insulates Harvey from criminal prosecution for failing to report his taxes. Because the government failed to provide any evidence to disbelieve Harvey's view of the agreement, it is apparent that the indictment entered against Harvey on November 25, 1985 for the first time put Harvey on notice that his understanding of the agreement conflicted with the government's view. After that point, it became unreasonable for Harvey to believe the agreement provided such broad immunity.

### III

In conclusion I wish to emphasize that this case presents unique facts and concerns which fortunately are of infrequent occurrence. The concern of the majority is that my view provides carte blanche authority to U.S. Attorneys to enter into plea agreements that will insulate criminals from liability for future criminal conduct. That concern has many answers, the chief of which is that U.S. Attorneys are responsible persons who do not conduct themselves as apprehended by the majority. I have tried to make clear that the holding is limited to the facts of this case. In this case, it was not unreasonable for Harvey to believe that the agreement covered the future tax consequences from the information he provided. Indeed, I have attached as an appendix excerpts from the testimony before the magistrate which show that the government may have interpreted the agreement to cover even more than this. I have also made clear that once Harvey was put on notice by the government that he was required to include income from the Cayman Island bank accounts on his income tax returns, he no longer could consider himself immune from prosecution for failure to report the income. Due process of law in the context of this case requires that Harvey be provided advance notice of the government's interpretation of the agreement, especially if the government's interpretation changed.

The majority contorts this simple case concerning an agreement not to prosecute into a use or transactional immunity case and then relies on irrelevant Fifth Amendment case authority. Here the same government that promised Harvey in a bona fide agreement that it would not seek to jail him based on information furnished in 1980 now seeks to breach that agreement. It must be remembered that the district court found: "that tainted evidence, evidence for which the defendant received both use and transactional immunity, was presented before the grand jury which returned the [tax evasion] indictment against him."

The majority fears that if the government is required to abide by its contract, a pandora's box will be opened where federal prosecutors will immunize criminals from being prosecuted for future crimes. That is obviously unreal. As I have explained, this case is an aberration. U.S. Attorneys seldom make oral agreements like this. We can have confidence that U.S. Attorneys will not abuse the informal method of granting immunity and presumably such agreements will be reduced to writing.

Harvey's due process rights not to be prosecuted pursuant to the government's agreement are violated by the majority's reversal of the district court's dismissal of the tainted indictment.

APPENDIX

The following are excerpts from the magistrate's report. (Record, Vol. 3, Tab 72).

Tom Haas [Harvey's attorney] and William Kimbrough, who was at the time of the agreement the U.S. Attorney in the Southern District of Alabama, testified the deal negotiated with Harvey was that Harvey would not be prosecuted for anything about which he told the Government nor would anything he said be used against him.

\* \* \* \* \* \*

Q. by Leonard Sands
A. by Tom Haas
Q. What was the bargain that was ultimately struck with the two of them?
A. Once it had been understood that he might be able to supply these things, the understanding I had with Ruddy and Billy was that nothing that Jerry Harvey said to them, or any agent on the Government would ever at any time be used against Jerry Harvey.
Q. And what does that mean, "would ever be used against Jerry Harvey?
A. That he wouldn't be prosecuted on the basis of what they found out from him.
Q. What instructions or advice did you give Jerry Harvey prior to his attending this meeting at the Sheraton?
A. Well, I told him just what I just said, and I remember that Jerry was very skeptical about that. He didn't seem to trust anybody, and maybe he didn't trust me either. Really, he didn't know me; anything about me. I was a small town lawyer in a small town to him, and I don't recall who had referred him to me. I usually try to find that out, particularly in drug cases, because I don't want to get in a situation where I am getting paid by somebody else.

I know that he was skeptical. I know he didn't trust anybody, and I had to literally force him to comply. I said, "I know these people, U.S. Attorney, and Assistant U.S. Attorney." I said, "I would stake my life on their honor and veracity."

\* \* \* \* \* \*

Mr. Sands asked Mr. Kimbrough:
Q. In return for Harvey's furnishing information, what was he to receive?
A. I was to dismiss the indictment against him.
Q. Do you know whether or not any—
A. And I would not prosecute him for anything he said; and I would not use anything he said as a means of going beyond this agreement to try to stir up trouble for Harvey.
Q. At that time as United States Attorney, you were speaking for yourself, and Southern District of Florida?
A. I can't say that. It was certainly my understanding that somebody had touched base with South Florida who wanted the information, and I assumed, and I continued to assume that nobody would have—
I certainly would not have asked Mr. Harvey to make a total disclosure had I thought that in doing so, I, you know, turned him loose to prosecution in some other district. I have no personal knowledge of that. That is all I am saying. That is not the way we operated, I assure you. We tried to treat everybody as human beings, although we tried to put some of them in the penitentiary.

\* \* \* \* \* \*

THE COURT: I need to interrupt you, Mr. Sands. Mr. Kimbrough, you made the statement that you would not have prosecuted him for anything he told you about.

Now, there are all different kinds of immunities, and we have been discussing that. We have been discussing transactional immunity versus use immunity.

If in telling you about all drug-related murders about which he had knowledge, Mr. Harvey told you that he killed some-

body in Mobile, Alabama, pursuant to this agreement, and this letter, and your understanding of this, could you prosecute him for that murder?

THE WITNESS: I don't know. I probably wouldn't have.

THE COURT: Could you use his statement or facts that he gave you in the statement in building of the murder case?

THE WITNESS: No, because it would be derived from the statement he gave.

\*    \*    \*    \*    \*    \*

Q. by Leonard Sands

A. by Jerry Lee Harvey

Q. As a result of those conversations, was it your understanding you had an agreement with the U.S. Attorney's Office in the Southern District of Alabama?

A. I knew I did. Mr. Kimbrough, and Mr. Favre told me, and Tom Haas told me.

Q. What did they tell you your deal was? What were you supposed to do?

A. I was supposed to tell them everything I knew about drug trafficking, people involved, how it took place, what happened to the funds, how you would register airplanes fictitiously. Anything I knew from 1975, and everything I had done from '75 up to the present time.

Q. And what was the Government's obligation to you in return for your cooperation?

A. They agreed nothing I ever give them would be used against me, nor would any U.S. Attorney's office seek to prosecute me for anything; that I was just getting a clean walk, and I should stay on the Government's side and help them.

\*    \*    \*    \*    \*    \*

The best that can be said as a summary of the evidence or statement made by Harvey to the Drug Enforcement Agents at that meeting is that Harvey told them all about his drug dealings in which he had been involved prior to his arrest in June of 1980, and including the arrest of 1980. This Court specifically finds from the facts adduced at the hearing that the

defendant Harvey also divulged to the Drug Enforcement Administration his financial dealings with respect to his illegal drug deals.

HATCHETT, Circuit Judge, dissenting.

I join Judge Clark's dissent. The agreement in this case covers the subject funds.

I hasten to add that nothing is gained by encouraging the government to enter into informal agreements, the terms of which are determined through evidentiary hearings in the district court and fact-finding in the in banc court, after the accused has completed performance.